## WILMOTH v. HAMILTON et al.

(Circuit Court of Appeals, Third Circuit. January 6, 1904.)

### No. 18.

1. SALES—CONTRACT—BREACH—EVIDENCE—LETTERS.

In an action for breach of an oral contract to sell plaintiff the output of defendant's coal mine at a certain price per ton, a letter written by plaintiff, not replied to, the day after the contract was made, purporting to be a memorandum of the terms of the contract as understood by plaintiff's agent, which did not differ from his evidence as to the terms of the contract, was not objectionable as a self-serving declaration.

2. SAME—CROSS-EXAMINATION.

Where defendant, after having sold the output of his coal mine to plaintiff for $1.10 per ton, stated the next day to the agent of another prospective purchaser that he had sold the coal to plaintiff for $1.15, with the understanding that, if he could get more for it, the sale was not binding, whereupon he was offered $1.16 per ton, at which price he sold the coal, a question, asked of defendant on cross-examination, as to what he told the agent of such subsequent purchaser about his contract with plaintiff, was not objectionable on the ground that it was immaterial, and asked for the purpose of discrediting defendant before the jury.

3. SAME—CONTRACTS—CANCELLATION.

Where, after defendant broke a contract to sell plaintiffs the output of his coal mine at a certain price per ton for a year, plaintiffs agreed to purchase the output for a particular month of the year, and, on defendant's writing that he would be unable to ship until he could get more

money from another, plaintiffs withdrew their offer for defendant's coal, such withdrawal should be construed to relate merely to the latter contract, and did not terminate plaintiffs' right to sue for breach of the contract for the sale of the output for the year.

**4. SAME—INSTRUCTIONS.**

Where, in a suit for breach of a prior contract for the sale of the output of a coal mine, it was claimed that certain correspondence canceling a subsequent contract only, operated as a cancellation of the first, an instruction submitting the construction of such correspondence to the jury as a mixed question of law and fact, to be determined in connection with all the testimony, was not prejudicial to defendant; the jury having found a cancellation of the subsequent contract only.

**5. SAME—DAMAGES—EVIDENCE.**

In an action for breach of a contract for the sale of the output of a coal mine, evidence that the entire output of the region producing coal of the character of that contracted for had been bought up by others, and that defendant's mine was the last one the output of which could be purchased, was admissible to show whether plaintiff, on defendant's breach of his contract, could provide himself with coal in the same market, and charge the excess in price, if any, to the vendor.

**6. SAME—ORDER OF PROOF—REBUTTAL.**

It is within the discretion of the trial court to permit the admission of evidence in rebuttal which should have been offered in chief, and, where such discretion is not abused, a writ of error will not lie to the trial court's action thereon.

**7. SAME—MEASURE OF DAMAGES—PROFITS.**

Where plaintiff purchased the output of defendant's coal mine at a stated price, to be furnished to a third person to whom plaintiff was bound to deliver the coal under a contract of sale, and there was no available market in which plaintiff could purchase goods of the same description, on defendant's refusal to perform, plaintiff was entitled to recover the difference between the price at which he had contracted to buy the coal and what he was to receive therefor from his vendee.

**8. SAME—INSTRUCTIONS—OBJECTIONS.**

Where, in an action for breach of a contract for the sale of the output of a coal mine, plaintiff would have been entitled to recover profits lost on a resale of the coal, defendant could not object to an instruction limiting the recovery to the difference between the contract and market price at the place the coal was to be delivered.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

W. H. Ruppel, for plaintiff in error.
Johns McCleave, for defendants in error.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. The case in the court below was a suit for damages for a breach of contract, by Hamilton & Co., the plaintiffs below, citizens of the state of Maryland, against Henry J. Wilmoth, defendant below, a citizen of the state of Pennsylvania. The facts disclosed in the record, and in the main undisputed, are as follows:

S. M. Hamilton & Co. were coal dealers in Baltimore, Md., selling Salisbury region coal. The plaintiff in error, Wilmoth, was operating a mine in the Salisbury region. Adams, a member of the firm of S. M. Hamilton & Co., on May 2, 1900, had an interview with

¶ 7. See Sales, vol. 43, Cent. Dig. §§ 1190, 1193.

the said Wilmoth, in Meyersdale, Pa., the home of the said Wilmoth, in relation to the purchase of the output of his mine. Adams testifies that he on that day drove out with Wilmoth to look at the mine and the coal produced from it, and afterwards, on the same day, met Wilmoth at the banking house of one Livengood, where he says the sale was made by Wilmoth. He testifies that:

"Mr. Wilmoth wanted $1.10 for his coal for that year, the entire output, and I wanted to pay not over $1.05, and we finally agreed on $1.10 for the entire output for one year, running from that day to April 1, 1901, that is, running from May 2, 1900, to April 1, 1901; the shipments to begin on the morning of May 3d, the next morning, at $1.10, and we were to get every car he loaded with the exception of possibly one car that he said he wanted for his home use. I said something about drawing the contract up in writing, and he said he didn't see that it was necessary, we both understood each other thoroughly; and he referred to Mr. Livengood, and Mr. Livengood said, yes, he knew both of us, he didn't think there would be any trouble at all; he knew both of us and he thought it would be to both our interests to continue. And the contract was made right then and there in his presence. Q. Mr. Wilmoth agreed to sell and you agreed to buy at that price? A. Yes, sir, conclusively. Q. What happened then? Did you have any further talk with him that day? A. No further talk. It was then about eleven o'clock and I wanted to return to Baltimore, and I had just time to get my satchel and get No. 6, the train on the B. & O. Road which got me to Baltimore that evening at six o'clock."

Wilmoth does not deny the making of the contract, as thus stated by Adams, but testifies that the sale was conditioned on his not being able to obtain a higher price for the output of his mine. Mr. Livengood, in whose banking office the interview between Adams and Wilmoth took place, confirms Mr. Adams' testimony as to the terms of the contract, says that Mr. Wilmoth referred Adams to him (Livengood) as to his responsibility, and that he said that he (Wilmoth) was a man of his word, and "I think he would do as he agreed to do." He states no condition as to the contract being only binding in case Wilmoth could not get a higher price.

On the next day, May 3d, after Adams returned to Baltimore, he wrote as follows:

"Baltimore, Md., May 3rd, 1900.

"H. J. Wilmoth, Esq., Meyersdale, Pa. Dear Sir:—We beg to confirm verbal conversation and contract made with you yesterday at Meyersdale by our Mr. Adams, in which you agreed to ship us the entire output of your Wilmoth mine on Salisbury Branch from date until April 1, 1901, at price of one dollar and ten cents ($1.10) per gross ton, f. o. b. cars at mine.

"We understand you can load about two hundred tons daily and will increase same to three hundred tons daily as soon as possible. We will pay for this coal monthly, say, on the 15th inst., or earlier if you desire.

"We write this in duplicate and you can accept same across face of letter and return one copy to us.

"Yours truly,                    S. M. Hamilton & Company."

The offer of this letter in evidence was objected to by counsel for the defendant below, on the ground that it was a self-serving statement by the plaintiff below, not assented to or acknowledged by the defendant. Its admission by the court is the first assignment of error in the record before us. We think it was not improperly admitted by the court below as being a written memorandum of the terms of the contract as understood by Adams, made immediately after its negotiation, not differing at all from his statement thereof in his oral

testimony. At all events, we cannot see that, even if its admission should be deemed technically improper, any injury resulted therefrom to the appellant, or that his case was at all prejudiced thereby. On the same day, to wit, May 3, 1900, in which the letter of Hamilton & Co., above referred to, was written, the appellant wrote to Hamilton & Co. as follows:

"Meyersdale, Pa., May 3rd, 1900.

"S. M. Hamilton & Company, Baltimore, Md. Gentlemen:—In reply to our conversation of yesterday, I am sorry to inform you that I will not ship you any of my coal at the present. Hoping this will not cause you any inconvenience, I remain,

"Yours respectfully, H. J. Wilmoth."

No reply was sent by Wilmoth to the letter of Hamilton & Co. of the same date, but there is the testimony of one Mr. Price, representing Niver & Co., a firm of coal dealers in Baltimore, that he had an interview with Wilmoth at Meyersdale on May 3d, the day of his agreement with Mr. Adams, of the firm of Hamilton & Co., and just after the making of the same. Mr. Price testifies that at that interview, Wilmoth told him that he had sold all of his coal to Hamilton & Co. on a year's contract, at the price of $1.15 a ton, with the understanding that if he could get more money for it, the sale was not binding, and that thereupon Mr. Price offered him $1.16 per ton, and on the said May 3d, the contract between Niver & Co. and Wilmoth, for his entire output of coal at $1.16 per ton, was finally made; that a written contract was prepared and executed between Wilmoth and Niver & Co., for the purchase of the coal, to which was added, at Wilmoth's suggestion, the following clause:—"It is agreed that in the event of S. M. Hamilton & Company entering suit for the output of this mine, that this agreement shall become null and void." Wilmoth, on cross-examination by the plaintiff below, did not deny that he had made this mendacious statement to Price, but said that he spoke jokingly in order to get an offer in advance from Price. This explanation does not, of course, relieve the moral obliquity of Wilmoth's conduct in this respect, and doubtless made an unfavorable impression on the jury as to Wilmoth's integrity. Counsel, therefore, objected to the question put to Wilmoth on cross-examination:— "What did you tell Mr. Price about your contract with Mr. Adams?" The objection was overruled and an exception taken, which is the subject-matter of the fourth assignment of error. Counsel object on the ground that what Wilmoth said to Price was an immaterial matter, and was elicited simply for the purpose of discrediting Wilmoth before the jury; that it was immaterial, because there was no dispute between the parties as to what the contract was, so that it made no difference what the witness said to anybody else in regard to it. It is not correct, however, to say that there was no dispute in regard to what the contract was, since Adams' statement of a definite and conclusive agreement to sell, by Wilmoth to Hamilton & Co., the whole output of his mine, for one year, at $1.10 a ton, differed widely from the statement by Wilmoth, that to this agreement there was attached a condition that it should not be binding, if he, Wilmoth, could get a higher price for the year's output of his mine. What

Wilmoth said, therefore, to Price, with relation to this contract, was in every way pertinent and material.

The defendant offered in evidence certain correspondence between Hamilton & Co. and Wilmoth, commencing on July 9th with a telegram from Wilmoth to Hamilton & Co., asking for a meeting on the next Wednesday. The meeting was had, and various verbal negotiations were testified to by Wilmoth, and after an interchange of several letters and telegrams, Wilmoth wrote, on July 25, 1900, to Hamilton & Co.:—

"You can have my coal until April 1st at $1.10 per ton, or I will sell you my coal next month at $1.05 per ton, and contract with you each month for my output, if we can agree on the price, until April 1st."

On July 26th, 1900, there is a telegram from Hamilton & Co. to Wilmoth, as follows:

"Your yesterday's letter received. Will take your output as offered. Prepare coal carefully. Start shipments immediately to Cary & Co., Locust Point, Baltimore, for our account."

This telegram was followed by a letter of the same date to the same effect. Then follow letters and telegrams from Hamilton & Co., on the 28th, 30th, and 31st of July, urging the shipment of coal, as agreed upon. On August 1st, Wilmoth writes to Hamilton & Co. as follows:

"Gentlemen:—In answer to your letter, it will be impossible for me to ship you any of my coal this week, until I get more out of Mr. Price, who is here now and will be here all the week."

On August 2d, Hamilton & Co. telegraphed, apparently before the reception of the letter of August 1st, from Wilmoth:

"No manifest from you yet. Are you loading coal for us? Answer."

Then, on the same day, there is the following letter:

"Baltimore, Aug. 2nd, 1900.

"H. J. Wilmoth, Esq., Meyersdale, Pa. Dear Sir:—Your letter of the 1st received. We are not surprised at the same. We hereby withdraw our offer made for your coal. When you make up your mind to do business in a businesslike manner, we can no doubt work together.

"Very truly,     Hamilton & Company."

Counsel for Wilmoth urged in the court below that such agreement or contract as was evidenced by this correspondence superseded the contract of May 2d, sued upon by plaintiffs, and they contended that "at any rate, plaintiffs, by their letter of August 2d" (above quoted) "rescinded whichever of the contracts was in force at the time, and thus terminated all dealings between the parties, and waived their right to recover any damages from the defendant." Neither of these contentions is sound. The subsequent agreement for the delivery of the output of coal for the month of August, 1900, was plainly a new, independent and different contract from the one sued upon, which was for the output of the mine for a year, and therefore did not necessarily, by its terms, cover the same subject-matter, as the prior contract, and did not therefore supersede the same, and it is perfectly evident that the plaintiffs' letter of August 2, 1900, referred to this subsequent contract, and cannot be interpreted as rescinding

the contract sued upon. The language used by the learned judge in his charge to the jury, which is the subject-matter of the sixth assignment of error, is as follows:

"Ordinarily, gentlemen, the construction of writings is a duty that falls upon the court, but in this case it is a mixed question of writing and testimony. These parties met, under the admissions of both, and there was verbal talk among them. Under those circumstances we do not feel it our duty to instruct you as to the effect of this second correspondence here, but submit the correspondence and the verbal talk between the parties for you to determine what bearing and weight they have in determining the controversy here involved."

We think this submission of the question to the jury was most favorable to the defendant, and that the assignment of error relating thereto, must be disallowed.

All the other assignments of error than those already noted relate to the measure of damages. The first assignment of error in this regard, is as to the overruling of defendant's objection to the admission of evidence as to "what was the market price for such coal as Mr. Wilmoth's output, delivered free on board the cars at Wilmoth's mine, for the several months of the year 1900, and up to the 1st of April, 1901?" The question in this form could not have been excluded upon the strictest construction of the law governing the measure of damages. The question arises, however, over the meaning of the words "market price." The plaintiff below contended that by the words "market price," he should be permitted to show the price which he and others received for coal f. o. b. at the mines, during the period covered by the contract; in other words, the price coal commanded, f. o. b. at the mines, in the market in which he and other dealers like him sold coal. The defendant contends, on the other hand, that "market price" is the price at which the plaintiff could, upon the refusal of defendant to furnish him the coal contracted for, have obtained other coal of like kind in that region, and that the measure of damages is the difference between the contract price and this market price of the article, at the time it should be delivered upon the ground; "that this is the plaintiff's real loss, and that with this sum he can go into the market and supply himself with the same article from another vendor." This is undoubtedly the rule, where plaintiff can make himself whole by being reimbursed for what it costs him in excess of the contract price, to supply himself in the general market with the articles that should have been supplied by his vendor. But cases may arise in suits for breach of contract of sale, where the application of this rule will not serve to make the vendee whole, and should not therefore be applied. The conditions may be such that no available market, in the proper sense of that word, in which the purchaser can supply himself, exists for the commodity sold, at the time of the breach.

In the case before us, the question as to the price that could be obtained for such coal, was limited to coal free on board in the region where Wilmoth's mine was situated, and Adams was called by the plaintiff, in rebuttal, to show that the entire output of the Salisbury region had been bought up by Baltimore shippers, and that Wilmoth's mine was the last mine, the output of which could be bought. The

defendant below objected to the offer of this testimony, on the ground that it was in rebuttal, and should have been introduced in chief by the plaintiff. The objection was overruled, and exception being taken by the defendant, the ruling of the court in this respect is the subject of the fifth assignment of error. The testimony so admitted is obviously pertinent to the question, whether a situation existed which allowed the plaintiff, when his vendor refused to furnish coal under his contract, to provide himself with coal in the same market and to charge the excessive price, if any, to the said vendor. We think there was no objection to this testimony, on the ground that it was offered in rebuttal, and not in chief. It was within the discretion, too, of the court below to pass upon the order in which testimony should be adduced, and there being no abuse of that discretion, a writ of error does not lie to its action in the premises.

Again, the rule, as stated, applies more particularly to cases, where articles, which the vendor has failed to deliver under his contract, are intended by the vendee for other uses and purposes than those of immediate resale. When the conditions concur, as they do in the case before us, the reason underlying the general rule fails, and the measure of damages must conform to the fundamental requirements of the law intended to secure indemnity to one who has suffered loss by the unlawful act or default of another. It is obvious that one who has bought goods from another at a stated price, to be furnished to a third person to whom he is bound to deliver under a contract of sale, can only be justly indemnified for a default of the original vendor, where there is no available market for the purchase of goods of the same description, by receiving from such original vendor, the difference between the stated price at which the goods were bought under the first contract, and that which he was to receive from his vendee under the second contract. In the case just stated, profits are the very object of and inducement to the contract, and so understood by both parties, they constitute the true measure of damages to the extent to which they may be ascertained. Profits are not excluded as a measure of damages, simply because they are profits, but only in cases where they are uncertain, contingent or speculative in their character; but where prospective profits are not of this character, they may, under certain limitations, be taken into consideration in estimating the value of the contract to the one who sues for its breach.

The language of the court below, in regard to the measure of damages, in its charge to the jury, was as follows:

"As we view this contract, gentlemen, if the contract existed, it was a contract for the sale of the output of a coal mine in the Salisbury coal region, for one year, at one dollar and ten cents per ton, free on board the cars at the mine. Now, under such circumstances, the subject-matter of the contract was mine output of coal, free on board the cars at Salisbury, and the measure of damages, if there is a valid contract between these parties, would be the difference between the contract price and the market price for which mine was selling, or could have been bought in the Salisbury region, during the several months succeeding the making of this contract and during the time it continued. In other words, gentlemen, the question is not what car-load lots of coal could be sold for in Baltimore, but the measure of damages is what a person could have gone to Salisbury and bought mine output coal at.

If he could have gone there, and there was a market price, and you have evidence of that, and the price of such output coal was more than $1.10 per ton, then the defendant, if he was bound by this contract, should make up that difference. If, on the other hand, the price of mine output coal during the succeeding months of that contract was not in excess of $1.10 per ton, the contract price, then the plaintiffs have not established their right to damages in this case, and your verdict should be for the defendant."

In reply to defendant's fourth point, requesting an instruction in reference to the measure of damages, the court says:

"The contract in this case, if such contract existed, was for the sale of the output of a mine in the Salisbury coal region, for one year, at $1.10 per ton, free on board the cars at the mine. The measure of damages in such a case. if the contract is valid and binding, would be the difference between the contract and the market price for which mine output coal was selling, or could have been bought in the market in the Salisbury region during the several months succeeding the making of the contract, and while the same was in force."

We think, therefore, that the court below were abundantly conservative in its rulings as to the admission of testimony on the subject of damages, and in its statement of the measure of damages to be applied by the jury, in its general charge.

What we have already said, makes it unnecessary that we should further discuss the evidence, in overruling the seventh assignment of error, which is, that the court below erred in denying the plaintiff's point, that under the pleadings in evidence in the case, the verdict of the jury must be for the defendant. So also in regard to the eighth assignment, which is, that the court, in reply to the defendant's point, that the plaintiff has not shown any loss arising out of the alleged breach of contract, said, "This is a question for the jury, and not for the court, to determine."

We find no error in this record, and the judgment below is therefore affirmed.