## UNITED STATES v. PALMER & PARKER CO. et al.

### No. 2681.

Circuit Court of Appeals, First Circuit.

June 27, 1932.

On Rehearing Oct. 28, 1932.

O. P. M. Brown, of Washington, D. C. (Frederick H. Tarr, U. S. Atty., and A. Chesley York, Asst. U. S. Atty., both of Boston, Mass., and Chauncey G. Parker, of Washington, D. C., on the brief), for the United States.

John W. Lowrance, of Boston, Mass., and Nathan W. Thompson, of Portland, Me. (Richard S. Chapman, of Portland, Me., on the brief), for appellee Palmer & Parker Co.

Harold Williams, Jr., of Boston, Mass. (George A. Furness, of Boston, Mass., on the brief), for appellee Bowery & East River Nat. Bank.

Before BINGHAM, ANDERSON (retired), and WILSON, Circuit Judges.

ANDERSON, Circuit Judge.

In the court below three admiralty suits were consolidated and a final decree entered on June 26, 1931, requiring the United States to pay to the Palmer & Parker Company $241,606.01, with interest, and to pay to the Bowery & East River National Bank $43,-202.95, with interest.

On March 23, 1921, the United States filed its libel in rem (No. 1969 Civil) against the freights, subfreights, charter hire and/or sub-charter hire of the Mt. Shasta, a merchant steamship belonging to the United States acting through the shipping board. This vessel had been chartered to the Mt. Shasta Steamship Company on May 19, 1920, for thirteen months at a gross hire of $506,940, payable in monthly installments in advance. The charter party provided, inter alia, that:

"The Owner shall have a lien upon all cargoes, and all subfreights, for any amounts due under this charter party. * * *"

"The charterer will not, without the written consent of the owner first obtained, make any sale, mortgage, pledge or other transfer

of any right under this charter party; * * * and such consent shall be upon the condition that the transferee shall, together with the charterer, assume jointly and severally all obligations of the charterer under this charter party, but the charterer may subcharter said vesesel for uses lawful for an American vessel, subject to all provisions of this charter party. * * * "

"The charterer will not suffer nor permit to be continued any lien, incumbrance or charge which has or might have priority over the title and interest of the owner in said vessel; but the charterer will in due course, and in any event within fifteen days after the same becomes due and payable, pay, discharge or make adequate provision for the satisfaction or discharge of every lawful claim or demand which, if unpaid, might, in equity, in admiralty, at law or by any statute of this or any other nation where said vessel may be navigating or berthed, have such priority over the said title and interest. * * * "

"A certified copy of this charter will be carried with the ship's papers; and the charterer shall take such other appropriate steps, as designated to it by the owner from time to time or required by the circumstances, as will give notice to the world that the charterer has no right, title or interest in said vessel, save and only the right specifically conferred on the charterer by this charter party, and that the charterer has no right, power nor authority to suffer or permit to be imposed on or against said vessel any liens or claims which might be deemed superior to, or a charge against, the title and ownership of the owner in said vessel."

On July 14, 1920, Victor S. Fox & Co., Inc., agents of the Mt. Shasta Company, and Palmer & Parker Company (hereinafter referred to as appellee), executed a charter party for the transportation of a cargo of mahogany logs from the west coast of Africa to Boston. Two days later, Fox, agent, borrowed from the Bowery & East River National Bank (hereinafter referred to as intervener) $75,000, and assigned to the intervener, as security, the charter party to the appellee and the freights accruing thereunder. A further like transaction took place on September 16, 1920, for a loan of $40,000. The intervener made no examination of any public records or other inquiry to ascertain the real ownership of the Mt. Shasta, but claims to have relied upon representations of Fox, agent, that it and/or the Mt. Shasta Steamship Company owned the vessel. Before these loans were made, the Mt. Shasta was registered by the bureau of navigation, department of commerce, as owned by the United States; the vessel's certificate of registry was on file in the custom house at New York City, in Lloyd's Register of Shipping issued July 1, 1920, in the Record of American and Foreign Shipping issued January 1, 1920, and in the American Bureau of Shipping. There is no contention that the intervener's loans were made to furnish the Mt. Shasta or were so used.

The vessel arrived on the west coast of Africa on August 8, 1920, was loaded with mahogany logs, and sailed for Boston on September 19th; she should have arrived thirty-five days later, on October 24th, but actually arrived on February 19, 1921. Discharge of her cargo was completed on March 7, 1921, and the vessel repossessed by the shipping board on June 7, 1921.

Meantime, Fox & Co. and the Mt. Shasta Steamship Company were in receivership. None of the freight for the voyage was ever paid except $52,500, half the estimated freight for the voyage; this was paid to the intervener. The balance of freight money and earned demurrage was kept by the appellee when the cargo was discharged. When the appellant's libel was filed, there was due the government under the demise charter $289,680. The libel sought to require the appellee to pay the freight money into court. The appellee resisted this claim, contending that it had claims for advances made to furnish the vessel, and a large claim for cargo damage on account of delay in the voyage. The court below sustained these objections and ordered the libel dismissed, as not falling within the admiralty jurisdiction. The Mount Shasta (D. C.) 291 F. 92. On appeal to the Supreme Court this decision was reversed, United States v. Freights, etc., of The Mount Shasta, 274 U. S. 466, 47 S. Ct. 666, 71 L. Ed. 1156.

Thereupon, it was stipulated that the net balance of freight money and demurrage due the Mt. Shasta under the charter party was $30,555.55, which, with interest, appellee held itself bound to pay to the appellant "or to whomsoever the court might hold to be entitled thereto." In its final decree the court held the intervener entitled to this money, as above set forth.

Eight days after the filing of appellant's libel, the appellee filed a libel against the appellant (No. 1973 Civil) for $150,000 for damages caused by the unseaworthiness of the

Mt. Shasta, preventing prosecution of the voyage with due diligence and dispatch. After full hearing, the court, on January 6, 1926, held the Mt. Shasta unseaworthy when the voyage was, begun; that because of this unseaworthiness and failure of Fox & Co. and the Mt. Shasta Company to furnish funds requisite to coal her, etc., she was delayed beyond the time when she should have arrived, October 24, 1920, until February 19, 1921. The shipping board had furnished a marine engineer, as well as funds, for the completion of the voyage. There resulted an interlocutory decree, referring the case to an assessor, appointed on April 28, 1928.

The assessor filed two reports, which on November 14, 1930, were confirmed, and all of the appellant's exceptions overruled. On May 18, 1928, these libels, No. 1969 and No. 1973, were consolidated.

On April 25, 1927, the intervener had filed its intervening petition against the appellant and against the appellee in No. 1973, alleging loans, made in good faith upon the security of the assignment of the Mt. Shasta Steamship Company's charter party with the appellee, and without notice or knowledge of any claim by appellant against the freight money or any part thereof. It also alleges that the original charter party from appellant to the Mt. Shasta Steamship Company "was not of public record anywhere and was not, brought to the knowledge of your intervenor nor could nor did your intervenor have notice thereof"; that a balance of $62,500 was still due on its loans, and seeks payment thereof from the balance of freight money due from the appellee or recovered as damages from appellant by the appellee.

On October 3, 1930, the appellant, appearing specially, excepted to the jurisdiction of the court below to entertain the intervening petition in No. 1973, on the ground that the intervener's alleged cause of action had occurred more than two years before the intervening petition was filed; and also on the ground that appellant's maritime lien against the freight money was superior to the claim asserted by the intervener; and that, if the intervener had exercised due diligence before making the loans on the security of the assignment of freight, it would have learned that the Mt. Shasta Company had neither power nor authority to create a lien against the freight of the Mt. Shasta superior to that of appellant.

On October 14, 1930, the intervener filed its written assent to the stipulation of May 14, 1928, in No. 1969. This stipulation between the appellant and the appellee, so far as now material, is as follows:

"Whereas it is admitted by Palmer & Parker Co. that the balance of freight in moneys earned by the SS. Mount Shasta is $37,877.35, and

"Whereas the vessel claims to have earned eight and six-tenths (8⁶⁄₁₀) days demurrage at the loading port at the rate of $1,500 per day, amounting to $12,900, which claim Palmer & Parker Co. contest, and

"Whereas there was advanced to the vessel the sum of £4,374½ while she was at her loading ports in Africa, the benefit of which advance Palmer & Parker Co. claims and the United States concedes to have been an advance payment on account of freight, the rate of exchange to be applied in converting same into the lawful currency of the United States being, however, in dispute.

"Now, therefore, the said parties stipulate and agree as follows:

"That the net balance of freight moneys and demurrage earned by and due to the Mount Shasta, less the payments on account of advances made, is the sum of $30,555.55.

"That Palmer & Parker Co. hereby holds itself bound to pay to the United States of America or to whomsoever the court may hold to be entitled to the Mount Shasta freight moneys the sum of $30,555.55, with interest at such rate and for such period as the court may determine."

After hearing argument, the court below, on May 25, 1931, overruled the appellant's exceptions to the intervener's petition of October 3, 1930, holding that the intervener's claim was superior to that of the appellant.

On February 10, 1927, the intervener had filed a libel in personam, No. 13 admiralty, against the appellee, containing substantially the same allegations above set forth as made in its intervening petition.

On March 18, 1930, this No. 13 admiralty was consolidated with No. 1973. The appellee answered in No. 13 admitting the allegations, except that it denied any liability in excess of $30,555.55, the net balance stipulated as due for freight and demurrage. The appellant is not a party in No. 13 admiralty. No separate finding of facts was made by the court below; but on September 15, 1931, an order was entered adopting the findings of the assessor as those of the court. No findings are made concerning the conflicting claims over the balance of freight and demurrage money, except so far as facts are

found in the opinion of the court and in the stipulation.

The appellee is a corporation engaged in the business of manufacturing veneers and lumber, with its mill and place of business at Boston (Charlestown). In 1920 and 1921, 85 per cent. or more of its business was in mahogany, which it imported from Africa, in logs. It was not a dealer in logs; it imported logs for manufacture and sale in various manufactured forms. In early February, 1920, it made a contract with the Victor Talking Machine Company to deliver during 1920 and 1921 about 4,000,000 feet of manufactured African mahogany, of various dimensions, at certain maximum and minimum prices, left for adjustment after the cost of the logs and the ocean freight rate had been determined. The Mt. Shasta's cargo and other cargoes were purchased in Africa to cover this contract and other commitments of the appellee. The Mt. Shasta's cargo of mahogany logs amounted to 2,156,542 feet, contents measure. After the arrival of the Mt. Shasta in February, 1921, the appellee delivered 1,603,818 feet of mahogany lumber to the Victor Talking Machine Company, and received payment therefor at prices approximately within the limits set forth in the Victor contract. The exact amount so delivered, which came from the Mt. Shasta cargo, is in dispute; that suitable for that contract was 846,377 feet.

In the United States there is no market for mahogany logs, in the sense that there is a market for cotton, wheat, and other staple commodities. There is such a market in Liverpool, where mahogany log auctions are held frequently. In this country the buying of logs is mostly limited to small concerns, having no African representative, who buy logs in small lots. There are no mahogany log dealers in Boston; the only users here were the appellee and one other small concern. In 1920 and 1921 there were only six importers of African mahogany, including the appellee, in the eastern part of the United States. The trial was directed to the false issue of the market value of logs in October, 1920, compared with an artificial market value for mahogany logs in February, 1921.

The District Court, adopting the findings and rulings of the assessor, held that the measure of damages in this case of delayed delivery of mahogany logs was the difference between the market value of the logs, as logs, on their due date, October 24, 1920, and their market value, as logs, on actual arrival, February 19, 1921. The total, thus reached, was found to be $200,000, divided into two parts of $185,000 if they had arrived in good condition, and $15,000 because of detriment during the unduly prolonged voyage. The appellant brings the case here on 32 assignments of error, most of which are directed to two main contentions:

(1) The rule of damages and certain alleged errors in the admission and rejection of evidence on damages. This covers assignments 4 to 27, inclusive.

(2) The ruling that the intervener's right to the balance of unpaid freight and demurrage was superior to that of the appellant; this covers 28 to 32.

(3) The first three assignments assert error in failure to find and rule, as required by Admiralty Rule 46½ (28 USCA § 723); and in overruling requests for findings and rulings, in 1973.

■ We think the court below erred in applying the market value of logs to this case. There is only one rule, of universal application, in such cases, and that is to give compensation for the loss suffered. Frequently, this ideal is found impossible of complete attainment; perhaps generally the market value rule is found to be the nearest approach to reaching the actual loss. But the market value rule is inapplicable when, on the facts, it is not the nearest practicable approach to an ascertainment of the actual loss. Each case must be governed by its own facts. Magnin v. Dinsmore, 62 N. Y. 35, 46, 20 Am. Rep. 442.

■ In this case the market value of logs had no real bearing on the loss suffered by the appellee. Its damage was limited to that caused by the delayed delivery of mahogany logs—not imported by it for sale as logs—but for manufacture and for sale in manufactured form. Its loss, if any, was in diminished prices, actually received by it, for the manufactured mahogany from these logs. If the logs had arrived in October, 1920, the appellee would not have sold them; it would have manufactured them, or kept them for manufacture. Arriving in February, 1921, it did not offer them for sale; it used them in large part, perhaps entirely, for commitments made before the drop in prices including the Victor contract. What similar contracts the appellee may then have had outstanding does not appear.

Moreover, the market value of the logs, as logs, was not within the contemplation of any of the parties. There was no real and substantial market for mahogany logs in this

country. The letterheads of the appellee described them as "importers and manufacturers of mahogany and veneer." Shack, who acted as the broker for the ship's agent in this transaction, apparently had had many transactions with the appellee, and presumably knew that they were manufacturers of mahogany, and not dealers in mahogany logs. It is also a fair inference that all of the parties knew that there were in this country no dealers, properly so described, in mahogany logs.

■ The burden to prove its damages is (as already noted) upon the appellee. If and in so far as the applicable rule of damages depends upon what was contemplated by the parties at the time of the contract, market value of the logs, as logs, is excluded. The appellee cannot be heard to assert the market value rule when there was no substantial mahogany log market in this country, and when, on all the evidence, it appears that no such rule was contemplated by any of the parties.

To repeat, the applicable rule is the actual loss, to the appellee, by the delay in delivery of this cargo of logs, for use in its business as a manufacturer and seller of mahogany veneers, etc.

■ We are unable to see how, in any aspect of this case, the evidence admitted, and apparently seriously considered, as to the effect of a possible sale of the Mt. Shasta's cargo, either in October, 1920, or in February, 1921, could have any bearing on the question of damages, even on appellee's own theory. The logs were not bought for sale; prospective or possible sale was not within the contemplation of the parties; there never existed in this country a quick market for any such quantity of logs as the Mt. Shasta cargo.

If the delay did the appellee any harm in the conduct of its business, it was in causing it a shortage of raw material (logs) during the nearly four months pending the arrival of the Mt. Shasta. The delay simply transmuted the appellee into a possible buyer— not a seller—of logs. It did buy, on November 19, 1920, a small lot, about 200,000 feet, at what price does not appear.

■ Of course if—as was claimed, and there is evidence in support—the Mount Shasta's logs were injured in quality by the unduly prolonged voyage, the appellee is entitled to recover for that element of damage.

The assessor seems to have proceeded on the theory that, by building up a meager, though highly artificial, market for the sale of mahogany logs in October, 1920, and then finding no market for selling mahogany logs in February, 1921, the appellee was damaged $185,000, apart from the damage to quality by the unduly prolonged voyage. On the facts in this case, we think this theory entirely untenable.

This case is, in effect, ruled by the decision of the Supreme Court in Illinois Cent. R. Co. v. Crail, 281 U. S. 57, 50 S. Ct. 180, 181, 74 L. Ed. 699, 67 A. L. R. 1423, a decision made after the assessor's first report, but before his second report. In that case, the railroad had lost, in transitu, 5,500 pounds of coal, and the plaintiff claimed that it was entitled to replace the loss at the retail market price at the consignee's place of business in Minneapolis. But the consignee was buying at wholesale prices; its actual loss was only the wholesale price.

The case is historically interesting. It was tried twice before the District court, who wrote two careful opinions in 2 F.(2d) 287 and 21 F.(2d) 836. In each of these opinions, the District Court expressed the opinion that the retail market value was not the proper rule. But the Court of Appeals for the Third Circuit reversed the first decision, 13 F.(2d) 459, and consequently the District Court, in compliance with the mandate of that court, in its second decision applied the retail market rule, although adhering to the views already expressed. This decision was affirmed by the Court of Appeals in 31 F.(2d) 111. But the Supreme Court overruled the Court of Appeals.

Referring to plaintiff's contention for the retail price to replace the coal lost, Mr. Justice Stone said:

"This contention ignores the basic principle underlying common-law remedies that they shall afford only compensation for the injury suffered, Milwaukee & St. Paul R. Co. v. Arms, 91 U. S. 489, 492, 23 L. Ed. 374; Chicago, M. & St. P. Ry. Co. v. McCaull-Dinsmore Co., supra, page 100 of 253 U. S., 40 S. Ct. 504, 64 L. Ed. 801; Robinson v. Harman, 1 Exch. 850, 855; Sedgwick, Damages (9th Ed.), 25; Sutherland, Damages (4th Ed.) § 12; Williston on Contracts, § 1338. * * * The rule urged by respondents was applied below in literal accordance with its conventional statement. As so stated, when applied to cases as they usually arise, it is a convenient and accurate method of arriving at an amount of recovery which is compensatory. As so stated, it would have been applicable here if there had been a failure to deliver the entire carload of coal, since

the wholesale price, at which a full carload could have been procured at point of destination, would have afforded full compensation, Chicago, M. & St. P. Ry. Co. v. McCaull-Dinsmore Co. supra; Central of Georgia Ry. Co. v. American Coal Co., 28 Ga. App. 95, 110 S. E. 320; Wendnagel v. Houston, 155 Ill. App. 664; Lake Erie, etc., R. R. Co. v. Fantz, 85 Ind. App. 569, 154 N. E. 875; Cutting v. Grand Trunk Ry., 13 Allen (Mass.) 381; Crutchfield & Woolfolk v. Director General of R. R., 239 Mass. 84, 131 N. E. 340; Smith v. N. Y., O. & Western Ry. Co., 119 Misc. 506, 196 N. Y. S. 521; Yazoo & M. V. R. Co. v. Delta Grocer Co., 134 Miss. 846, 98 So. 777; Chicago, R. I. & Pac. Ry. Co. v. Broe, 16 Okl. 25, 86 P. 441; Roth Coal Co. v. Louisville & Nashville R. R., 142 Tenn. 52, 215 S. W. 404; Quanah A. & P. Co. v. Novit, 199 S. W. 496 (Tex. Civ. App.), or, in some circumstances, if respondent had been under any constraint to purchase less than a carload lot to repair his loss or carry on his business, for in that event the measure of his loss would have been the retail market cost of the necessary replacement, Haskell v. Hunter, 23 Mich. 305, 309. But in the actual circumstances the cost of replacing the exact shortage at retail price was not the measure of the loss, since it was capable of replacement, and was, in fact, replaced in the course of respondent's business from purchases made in carload lots at wholesale market price without added expense.

"There is no greater inconvenience in the application of the one standard of value than the other, and we perceive no advantage to be gained from an adherence to a rigid uniformity, which would justify sacrificing reason of the rule, to its letter. The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable. See Wilmoth v. Hamilton (C. C. A.) 127 F. 48, 51; Theiss v. Weiss, 166 Pa. 9, 19, 31 A. 63, 45 Am. St. Rep. 638; Pittsburg Sheet Mfg. Co. v. West Penn Sheet Steel Co., 201 Pa. 150, 50 A. 935; Williston on Contracts, §§ 1384, 1385."

This is a plain denial of the right of such a plaintiff to have unjust enrichment from the wrong thus suffered. It applies a rule adapted to the real situation.

In this case, where there was no real market for mahogany logs, the attempt to apply the market value rule involved more of doubt and confusion than an attempt to assess the real damages suffered by appellee; there was less inconvenience in seeking justice and reality than in seeking the mythical and nonexistent market value of logs. This aspect of the trial before the assessor is shown by assignments 9 to 14, inclusive.

Another case asserting the same fundamental rule is Wertheim v. Chicoutimi Pulp Co., L. R. 1911 A. C. 301. In that case, the plaintiff sued to recover damages for delay in delivery of a quantity of moist wood pulp, claiming the difference between 70s., the market price at the port of delivery on the due date, and 42s. 5d., the market price at the same place on the date of actual delivery. But it appeared that the plaintiff sold the pulp for 65s., and it was therefore held that he was entitled to recover only the difference of 5s., his actual loss, not the profit that the market value rule would have given him. See, also, Williams Bros. v. Agius, L. R. 1914 A. C. 510; The Iossifoglu (D. C.) 32 F.(2d) 928.

It would not be helpful to review the almost innumerable cases in which damages have been discussed. Many of them are cited, supra, in Mr. Justice Stone's opinion.

■ It was error to rule the Victor contract immaterial. This contract, and any other similar, outstanding commitments in which the appellee might have used or did use the Mt. Shasta cargo of logs, were competent. Such theoretical damages as loss of good will is too remote and speculative.

We turn now to the intervener's case.

As noted above, there is no formal statement of the facts concerning the intervener's claim. In the opinion of the court below, sustaining the intervener's claim, the amount in controversy is referred to simply as "balance of freight money." This overlooks the fact that it must have been in substantial part made up of demurrage, and that the assignment to the intervener did not, at least in terms, cover any demurrage.

■ Dealing with the merits, the court sets forth: "The assignment of the freight money put the bank into the shoes of the assignor as to the enforcement of rights."

On this theory of law the assignee has no standing. The assignor had no right to make this assignment.

■ Later in the opinion, the court says:

" * * * the assignment to the bank of sums due and to become due under the specified contract would convey rights in them which, having been acquired for value without

notice of the Government's claim, take precedence of it."

This is not only inconsistent with the view above stated, but amounts to saying that the assignee was in the legal position of the holder of a valid duly recorded mortgage. As the charter party was not recorded, and no provision of law is pointed out under which it could be recorded, we have to consider whether an assignment of it, which the assignor had no right to make, gave the assignee, without inquiry as to the ownership of the Mt. Shasta, or of the right of the assignor to make the assignment, the rights of a bona fide holder for value without notice.

As noted above, the intervener alleged that the original charter party from the shipping board to the Mt. Shasta Steamship Company "was not of public record anywhere, was not brought to the knowledge of your intervenor, nor could nor did your intervenor have notice thereof." But this allegation is contrary to the controlling facts—for the ownership of the Mt. Shasta was (as noted above) of record in four public records, any one of which, if examined, would have shown the intervener that the Mt. Shasta Steamship Company was not the owner of the vessel. The intervener admits these records. Examination of any one of them would naturally have led to inquiry as to the title and right of Fox, Inc., agent, and charged the bank with full knowledge of the charterer's lack of right to make assignment of the charter party. United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361. The charter party was also required to be among the ship's papers, and, so far as appears, was there.

■ Intervener's learned counsel is in error in referring to the Mt. Shasta Company as a "purchaser in possession." It was, as already stated, nothing but a charterer, with an option, to be exercised only on ten days' written notice, for purchase, on stated terms. No such notice was given. The appellant had all the rights of an owner, except those disposed of by the charter party.

No statute or case is cited showing that, under such circumstances, the lien sought to be reserved in behalf of the United States can be overridden by a mere assignee of the charter party. We think the question must be determined on the same principles enunciated by the Supreme Court in United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361. In that case the Supreme Court held that even maritime liens for supplies furnished vessels owned by the United States could

not be maintained where such supplies were ordered without authority. It is true that the case turns on the provisions of section 3 of the act of June 23, 1910, c. 373, 36 Stat. 604. That section, after enlarging the right to a maritime lien and providing who shall be presumed to have authority from the owner to secure supplies for the vessel, proceeds:

"But nothing in this Act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

Cf. The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386; The Neponset Cases, 13 F.(2d) 808 (C. C. A. 1); Thurlow v. Crowninshield Shipbuilding Co. (C. C. A.) 46 F.(2d) 992.

The rights of an assignee of an unauthorized assignment of a charter party cannot be greater than those of a materialman furnishing supplies necessary for the vessel.

Such a holding would defeat the whole purpose of the government in providing in the charter that the charterer should make no pledge or other transfer of any right under the charter party "without the written consent of the owner first obtained," and then that the transferee should assume all obligations under the charter party. What more the United States could have done to insure its rights to the freights and sub-freights it is difficult to conceive. Its title to the ship was publicly recorded. It provided in the charter party itself that the charter should be carried with the ship's papers, so that if, in a foreign port, where the public records above referred to might be unavailable for immediate examination, any person could, by ordinary examination of the ship's papers, ascertain fully the limitation on the rights of the persons in physical possession thereof.

■ We are unable to hold that the rights given by this charter party were in abeyance pending repossession of the vessel. The decision by Judge Rose in 1924 A. M. C. 131, at page 135, cited and apparently relied upon by the court below, is, if in point (which is at least doubtful) not binding on us.

This case has already been in court over eleven years. It is obviously highly desirable, if practicable, that it now be disposed of. The item of $185,000 for loss of market value of logs is, of course, disposed of by what we

have already said. An item of $15,000 for physical injury to the cargo resulting from the unduly prolonged voyage, is perhaps supported by a fair preponderance of the evidence, although there is persuasive evidence to the contrary.

Another item of damage inferentially indicated in this defective record, is of $28,956.72 on 361,959 feet of so-called "No. 2 Common."

If this case can now be disposed of by offsetting against the amounts of $15,000 and $28,956.72, with interest at the statutory rate of 4 per cent. (41 Stat. p. 525, § 3 [46 USCA § 743]), the amount of $30,555.55 (with interest) admittedly due from the appellee, a judgment accordingly may be entered. But as on this record we cannot be sure that, under the rule of damages which we have adopted, the appellee may not make other reasonably arguable substantial claims, if, within such reasonable time after mandate from this court as the court below may fix, the appellee shall file in that court specifications for such claims, then the case may stand for further hearing thereon, as well as on all contentions concerning the items of $15,000 and $28,956.72, above noted.

The decree of the District Court is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion; the appellant recovers costs of appeal against both Palmer & Parker Company and the Bowery & East River National Bank.

## On Rehearing.

On the petition for rehearing of the appellee, Palmer & Parker Company, granted September 6, the question of the rule of damages has been fully reargued. The court adheres to the view that appellee's damages are not to be tested by the market value of the mahogany logs, as *logs*.

The appellee has filed in this court a motion for leave to file specifications and take evidence thereon. The motion is allowed, so far as the filing of the specifications is concerned; otherwise it is denied. The same specifications will, of course, be filed in the court below.

We now refer to the specifications so far as necessary to amplify our original holding that "the applicable rule is the actual loss to the appellee, by the delay in delivery of this cargo of logs, for use in its business as a manufacturer and seller of mahogany

veneers, etc." The specifications contain six basic items:

I. *Loss on Grades Not Called for or Taken by Victor Contract.*

Under this heading, all questions of fact are open for full trial,—including the dates of determination of market values and the actual market values, of the various kinds of mahogany manufactured from the Mount Shasta cargo. But the appellee cannot assess damages on the United States by sales made at less than the shown market prices.

II. *Loss on Grades Sold to Victor under Contract out of Mount Shasta Cargo.*

Under this heading, appellee contends that the prices under the Victor contract were reduced, on February 15, 1921, retroactively, because of the delay and fall in market prices. The burden is upon the appellee to show that such reduction was caused by the delay, and not by reason of the provisions of the Victor contract.

III. *Mill Shutdown.*

On the theory of loss on cut out-turn which we adopt, counsel for the appellee concedes that this item of $24,375 should not be included.

IV. *Deterioration of Logs*, is the item of $15,000 referred to in the original opinion. All questions of fact as to that item are open at the new trial.

V and VI are claims for interest for four months at 6 per cent. on the cost of the Mount Shasta cargo ($4,740), and on the prepaid freight ($1,050). These items are not proper elements of damage if the appellee is allowed the difference in the market value of the manufactured product by reason of the delay.

We cannot adopt the contention of appellant's learned counsel that the reduction in prices involves such a drop as to make the market values of the manufactured product, at the comparable dates, an inapplicable test.

It is ordered that the decree of June 27, 1932, be amended to read as follows:

The decree of the District Court is vacated, and the case is remanded to that court for further proceedings not inconsistent with the opinion of June 27, 1932, and the opinion passed down this day; the appellant recovers costs of appeal against both Palmer & Parker Company and the Bowery & East River National Bank.