## CAPPETTA v. ATLANTIC REFINING CO.
### No. 159.

Circuit Court of Appeals, Second Circuit.
Dec. 3, 1934.

George E. Beers and William L. Beers, both of New Haven, Conn. (Basil O'Connor, of New York City, on the brief), for defendant-appellant.

Edward L. Reynolds and George J. Grady, both of New Haven, Conn., for plaintiff-appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff's mother, Raffaela Cappetta, leased to the defendant certain land in New Haven, Conn., for the term of five years from June 8, 1933, with a provision for hold-over renewal from year to year unless either party should elect to cancel upon written notice given ninety days prior to the expiration of any current yearly term. For present purposes the leased premises are sufficiently described as Nos. 240-246 Wooster street. The defendant is a corporation engaged in producing and selling petroleum products and acquired the land so leased for the purpose of maintaining a gasoline station for the sale of its gasoline and kindred products to the public at retail. The rental payable under the lease was, subject to a fixed minimum, an amount equivalent to one cent per gallon for all gasoline or other motor fuel sold on the premises.

The plaintiff's mother also owned and, on June 8, 1933, leased to the defendant a plot of land across the street from the first location. This lease, known as "Atlantic Garage Lease Agreement," ran for five years with provision for hold-over extensions from year to year unless terminated by either party as therein provided. It also contained a clause providing that the lessor might, at her option and upon the payment of $400 to the lessor for the repurchase of certain named property on the premises which the lessor had purchased of her, cancel the lease on thirty days' notice.

The plaintiff, on June 8, 1933, entered into an agreement with the defendant which is called "Type B Atlantic Authorized Dealer's Agreement," and thereby the plaintiff was made the defendant's "authorized dealer for the sale of the Company's Atlantic White Flash, motor fuels, lubricants, other petroleum products and specialties at the Dealer's place of business at 240-246 Wooster Street, New Haven, Connecticut." It provided that the defendant would sell to the plaintiff and that the plaintiff would buy of the defendant all of her requirements of the above-mentioned products to be sold on the premises at an agreed price less an agreed commission or discount. This agreed price, from which was deducted the commission or discount, was the defendant's open market service station price prevailing at the time and place of each delivery. There was no agreement as to the price at which these products would be sold to the public by the plaintiff. The contract in terms was to remain in full force for five years from its date unless the Atlantic Garage lease agreement should be canceled prior to June 8, 1938, in which event the defendant might, at its option, at any time terminate its contract with the plaintiff by giving the notice therein provided. If this happened, it was agreed that the defendant might repossess the premises forthwith and, if it did, that it would account to the plaintiff for any of its products in merchantable condition which the plaintiff might have purchased from it and have on hand.

Following the execution of the above contract, the plaintiff, through her agents, acted as the defendant's authorized dealer at the premises named to the satisfaction of all concerned until the plaintiff began to sell gasoline at prices lower than the defendant's open market service station price. This greatly increased the plaintiff's sales though her profit per gallon was lessened. It also had a tendency to disrupt the defendant's marketing of its products in the affected area and led to complaints by the defendant's competitors. The district manager of the defendant testified in part as follows concerning the effect of what the plaintiff was doing: "From my experience in the business and my knowledge of conditions, my contact with competitors and others, the effect of the maintenance of a cut rate posted price at this station doing the business that this station has been doing and making a cut of 1½¢ a gallon will be ruinous upon market conditions because no doubt as in the past our competitors will meet the price posted at this station and in defense of the other customers that we have in the same vicinity we would be forced to reduce our price in which case the customer has repeatedly said that he will again cut the price and drag the market down again."

There was also some evidence that the plaintiff had substituted and sold other gasoline as that of the defendant, but that was disputed, and it is apparent that the basic reason for the attempt of the defendant to terminate the contract was the plaintiff's conduct in posting cut rates and selling at them. On July 12, 1934, the defendant wrote the plaintiff that:

"On account of your failure to live up to your contract dated June 8, 1933, this company can no longer continue you as its authorized dealer at the above location and you are hereby notified to vacate the premises forthwith.

"On your so vacating the company will at once reimburse you for any gasoline remaining in the tanks."

■ For the purposes of this appeal we may assume, without deciding, that the defendant has no legal excuse for refusing to perform its contract. This contract, however, is for the sale to the plaintiff of goods for the purpose of resale to the public. The only benefit, apparent on this record, which can be derived by the plaintiff from the performance of the contract, is the net profit she can make from the resale of the goods. The loss she will suffer, if the defendant does breach the contract, is the loss of such net profit. This is purely a commercial contract entered into for the kind of profit which may be stated in terms of money. Ordinarily, an action at law for money damages affords a plain, adequate, and complete remedy for the breach of such a contract, and, where there is a plain, adequate, and complete remedy at law, a suit in equity will not lie. 28 USCA § 384. This principle of our form of jurisprudence has been thoroughly established. As put by Mr. Justice Gray in Buzard v. Huston, 119 U. S. 347, 7 S. Ct. 249, 251, 30 L. Ed. 451:

"The effect of the provision of the judiciary act, as often stated by this court, is that 'whenever a court of law is competent to take cognizance of a right, and has power to proceed to a judgment which affords a plain, adequate, and complete remedy, without the aid of a court of equity, the plaintiff must proceed at law, because the defendant has a constitutional right to a trial by jury.' Hipp v. Babin, 19 How. 271, 278 [15 L. Ed. 633]; Insurance Co. v. Bailey, 13 Wall. 616, 621 [20 L. Ed. 501]; Grand Chute v. Winegar, 15 Wall. 373, 375 [21 L. Ed. 174]; Lewis v. Cocks, 23 Wall. 466, 470 [23 L. Ed. 70]; Root v. Railway Co., 105 U. S. 189, 212 [26 L. Ed. 975]; Killian v. Ebbinghaus, 110 U. S. 568, 573, 4 S. Ct. 232 [28 L. Ed. 246]."

And in New York Guaranty Co. v. Memphis Water Co., 107 U. S. 205, 2 S. Ct. 279, 287, 27 L. Ed. 484, it was said that one purpose of the statute was to emphasize the rule "and to impress it upon the attention of the courts." Indeed, the necessity for the application of the principle is as vital as is the need for preserving the constitutional guaranty of the right to trial by jury as it existed when the statute was passed.

■ There is nothing whatever in the present cause to take it out of the general rule unless we must say that actual experience during the term of the contract is the only way to establish the worth of the contract to the plaintiff and so that there is no plain, complete, and adequate remedy at law because her damages for a breach cannot be ascertained upon a trial by jury. It is true that, if the contract were fully performed by the parties, its value to the plaintiff would be only a matter of computation from known data which would eliminate the uncertainties inherent in any attempt to predict the future course of events. But this alone is not sufficient reason for depriving a party of the right to a jury trial. Were it so, every contract for the sale of goods to be resold could be enforced by a decree for specific performance if the seller failed to perform and the buyer, having a cause of action for the breach, preferred performance to compensatory damages and brought his suit in equity for such relief. The mere statement of such a proposition is enough to refute it.

This contract had been performed for more than a year before the defendant tried to end it after the plaintiff had begun to cut prices. The requirements of the plaintiff as determined by her sales at regular service station prices and at her cut rate prices as well can be fairly determined. From such testimony as must be readily available, her damages, if she should eventually be found entitled to recover, can be fixed with but little real difficulty. Certainly there will be no unusual trouble in this respect. See Wilmoth v. Hamilton (C. C. A.) 127 F. 48.

Nor does the fact that the contract may be terminated by the defendant if the plaintiff's mother should cancel the "Atlantic Garage Lease Agreement" covering the location across the street alter the rights of the parties. It is a condition to be considered in the light of such circumstances as the evidence may disclose relating to the duration

of the contract as in instances where the right to the performance of an agreement for a stated time is in terms made subject to acts of God, strikes, and other similar occurrences not within the control of the parties. It would be strange, indeed, if a party, the extent of whose right was doubtful, could compel specific performance of a contract simply because of the uncertainty of the right and on that ground deprive his opponent of a trial by jury. As the plaintiff has a plain, complete, and adequate remedy at law, that is her exclusive remedy. Compare Javierre v. Central Altagracia, 217 U. S. 502, 30 S. Ct. 598, 54 L. Ed. 859.

Decree reversed.