Nathan LAPIDUS and William Lapidus, a copartnership, doing business as M. Lapidus & Sons, Plaintiffs,

v.

CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a corporation, Defendant.

No. 55 C 481.

United States District Court N. D. Illinois, E. D.
April 2, 1958.

Leroy W. Gudgeon, Chicago, Ill., for plaintiffs.

C. W. Krohl, Andrew C. Scott, J. I. Shields, T. G. Schuster, Chicago, Ill., for defendant.

KNOCH, District Judge.

This action having been tried by the Court without a jury, the Court having had the benefit of argument of counsel on briefs, being fully advised in the premises, on the whole case, makes the following:

### Findings of Fact.

1. Plaintiffs are individuals and citizens of the State of Illinois engaged in the business of buying and selling perishable commodities at wholesale in the City of Chicago, Illinois.

2. Defendant and its connecting carriers are common carriers by rail performing transportation services for hire in interstate commerce between points in the States of California and Illinois.

3. Between July 1, 1952, and July 1, 1953, plaintiffs were the receivers, or consignees, in Chicago, Illinois, of 63 shipments of perishable goods which were originated at 8 different shipping points in California. These points included the stations of Salinas, Mendota, Santa Maria, Biggs, Huron, Oceano, San Joaquin, and Dos Palos, California. The Southern Pacific Railroad was the originating carrier for all the shipments except two from Santa Maria, California, which originated on the Santa Maria Valley Railroad. The defendant, Chicago, Burlington & Quincy Railroad Company (hereinafter referred to as the "Burlington") was the delivering carrier for all 63 shipments. The Chicago, Rock Island and Pacific Railroad (hereinafter referred to as the "Rock Island"), the Denver and Rio Grande Western Railroad (hereinafter referred to as the "Rio Grande"), and the Union Pacific Railroad were the connecting or "bridge" carriers for the 63 shipments. Individual participation by said bridge carriers in the carriage of the 63 shipments depended upon the point of origin and the route selected by the shipper.

4. Each of the 63 shipments traveled distances ranging from 2,100 to 2,400 miles between origin and destination. At various places on the Southern Pacific, the Rio Grande and the Union Pacific, it was necessary to carry the 63 shipments over and down steep grades which required the furnishing of additional motive and braking equipment, depending upon the length, weight and consist of the trains in which they moved. At various places on all the railroads, all 63 shipments were subject to regular, anticipated terminal delays in order for the trains to be classified and the cars properly interchanged. During these terminal delays, the cars

were serviced with ice and heat, when necessary, and inspections made for defects in the equipment. While the terminal delays were anticipated, the exact time consumed could not be anticipated, being dependent in each case upon the size of the trains, and the needs of the shipments for the protective service.

5. Each of the 63 shipments was billed on a Uniform Straight Bill of Lading contract which constituted the receipt and contract of carriage. In each contract it was provided and agreed that the carriers should transport the shipment with "reasonable dispatch" but not in time for any particular market nor by any particular train.

6. At no time did any of the railroads handling the 63 shipments have a through schedule from the eight California shipping points to Chicago. Instead, each rail carrier had its own advertised schedule for perishable traffic moving over its own portion of the through route. The combination of these individual schedules, when taken together, provided for the movement of perishable traffic between each of the eight California shipping points and Chicago by the 7th morning following receipt of the shipments at the shipping point, provided said shipments were received by the originating carrier prior to the closing time for the origin station. At the time the 63 shipments moved, the closing times at the eight California shipping points ranged from 5:00 P.M. to 11:59 P.M., depending on the station and its distance from major railroad terminals on the Southern Pacific.

7. Prior to July 1, 1952, it was customary for plaintiffs to receive shipments in Chicago from each of the said eight California shipping points prior to 7:00 A.M. on the 7th morning following their receipt at the origin station, provided said shipments were received prior to the closing time for the origin station. The term "7th morning delivery" refers to delivery in Chicago from California points according to this custom.

8. Sixty of the 63 shipments in this suit were received by plaintiffs in accordance with this custom of 7th morning delivery. The remaining three shipments (Cars WFEX 73995, PFE 75097 and PFE 63058) were received by plaintiffs prior to 7:00 A.M. on the 8th morning following their receipt in California. In the case of Cars WFEX 73995 and PFE 75097, neither was received by the originating carrier prior to station closing time. In the case of Car PFE 63058, plaintiffs suffered no loss between the 7th and 8th morning because there was no decline in the market between those times, decline in market price being urged by plaintiffs as the measure of their damages.

9. After July 1, 1952, and during the period when plaintiffs' 63 shipments moved, the custom of 7th morning delivery in Chicago was sometimes varied by the adoption of faster operating schedules on a non-official, experimental basis, which were designed to move perishable traffic from California to Chicago on a 6th morning basis.

10. These faster schedules took the form of "operating" schedules and were adopted by the rail carriers on an experimental basis for a period of one year to test the feasibility of railroad operations on a 24-hour expedited basis. During the period of these experimental schedules, the official advertising of schedules of the rail carriers, producing the 7th morning delivery time in Chicago were not altered or withdrawn. Plaintiffs, or their agents, knew of the experimental nature of the faster schedules, and knew that the terms and conditions of the Uniform Straight Bill of Lading Contract relating to the obligation to carry were not changed during this period.

11. Plaintiffs' 63 shipments were carried during the period from July 1, 1952 and July 1, 1953, or during the time when the faster schedules were in effect on an experimental basis. Between July 1, 1952 and July 1, 1953, plaintiffs did receive some shipments in Chicago from California points prior to

7:00 A.M. on the 6th morning after receipt by the originating carrier. On an overall basis, particularly before December 31, 1952, the pattern of deliveries on the 6th morning was not regular or consistent. All but four of plaintiffs' 63 shipments were carried before December 31, 1952. The term "6th morning delivery" refers to plaintiffs' experience in receiving shipments in accordance with the faster experimental schedules.

12. Failure to deliver on the 6th morning sometimes worked to plaintiffs' advantage where there was an incline in the market between the 6th and 7th mornings.

13. The failure of defendant and its connecting carriers to carry and deliver plaintiffs' 63 shipments on a 6th morning basis did not constitute a failure to deliver with "reasonable dispatch."

14. The failure of defendant and its connecting carriers to carry and deliver Cars WFEX 73995 and PFE 75097 prior to 7:00 A.M. on a 7th morning basis did not constitute an unreasonable delay in the delivery of said shipments.

15. The failure of defendant and its connecting carriers to carry and deliver Car PFE 63058 prior to 7:00 A.M. on a 7th morning basis resulted in no market decline loss to plaintiffs between the 7th and 8th mornings.

16. Plaintiffs proved that the Chicago wholesale market declined in an aggregate amount of $4,501.59 between the 6th and 7th mornings for perishables of the kinds that were carried in the 63 shipments. Plaintiffs did not prove that the perishables in the 63 shipments were comparable in quality and condition to those sold on the Chicago wholesale market, did not prove that they sold the perishables in the 63 shipments upon the declining markets between the 6th and 7th mornings, and did not prove that

they suffered actual losses equivalent to the declines that the market experienced.

### Conclusions of Law.

1. This suit is one at law arising under the provisions of the Interstate Commerce Act, Title 49 of the United States Code Annotated. The Court has jurisdiction of the parties and the subject matter.

2. Under the terms of its transportation contracts, defendant and its connecting carriers were obligated to carry plaintiffs' 63 shipments with reasonable dispatch, but not by any particular train, nor in time for any particular market.

3. During the period in which plaintiffs' 63 shipments moved, the pattern of deliveries on an expedited experimental basis had not become uniform nor so well established over a period of time that it had become a custom upon which plaintiffs could rely.

4. Delay in the delivery of three of plaintiffs' shipments for periods ranging from 19 to 24 hours was not an unreasonable delay where the goods were transported distances ranging from 2100 to 2400 miles by connecting carriers in the circumstances described.

5. Plaintiffs' proof of loss because of market declines on goods allegedly delayed was insufficient to carry their burden of proof on the issue of damages where they relied exclusively on market quotations to establish the fact of decline, but failed to link the market quotation declines to their own experience in selling on the declining market, and failed to correlate the quality and condition of their own goods to the quality and condition of the goods in the market quotations.

6. Defendant is entitled to judgment and dismissal of plaintiffs' claims herein.