The GREAT ATLANTIC & PACIFIC TEA COMPANY, Inc., Plaintiff,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Defendant.

No. 57 C 745.

United States District Court
N. D. Illinois, E. D.
Jan. 6, 1964.

Hopkins, Sutter, Owen, Mulroy & Wentz, Chicago, Ill., Thomas R. Mulroy, Daniel Walker, Chicago, Ill., Fred E. Campbell, New York City and E. J. Donahue, Chicago, Ill., of counsel, for plaintiff-appellant.

Floyd J. Stuppi, John J. Schmidt, William J. O'Brien, Jr., Sidley, Austin, Burgess & Smith, Chicago, Ill., for defendant.

CAMPBELL, Chief Judge.

This cause, a claim for damages by plaintiff, The Great Atlantic and Pacific Tea Company, Inc., against defendant, The Atchison, Topeka and Santa Fe Railway Company alleging unreasonable and unexcused delay in a shipment, having come on for trial upon a stipulation of facts, is presently before me upon the briefs of the parties.

The facts are as follows: Plaintiff Great Atlantic & Pacific Tea Company (hereinafter referred to as "A & P") is a New Jersey corporation engaged solely in the retail grocery business operating retail stores in which it sells fresh foods, vegetables and other items. Defendant, The Atchison, Topeka and Santa Fe Railway Company (hereinafter referred to as "Santa Fe"), is a corporation engaged in business in Illinois and other states as an interstate common carrier by railroad. Defendant is a "carrier" within the meaning of that word as used in the Interstate Commerce Act, as Amended, and was the initial carrier as described in Section 20(11) of the Interstate Commerce Act, Title 49, U.S.C., Section 20(11) for the shipment of plums described below. This shipment was made under a uniform straight bill of lading issued by Santa Fe and signed by A & P and Santa Fe.

On June 2, 1956 a shipment was made by A & P consisting of a carload of California Beauty Plums from Red Banks, California consigned to A & P at Harlem River, New York, which is one of the receiving points of A & P for produce for the New York area. The plums were delivered to A & P by Santa Fe at 5:30 A.M. on June 12, 1956. Under the usual and customary time for transportation and delivery by railroad from Red Banks, California to Harlem River, New York, the plums should have been delivered to A & P prior to 9:00 A.M. on June 10, 1956. The period of delay was unreasonable and unexcused but was not intentional. The produce was not transported and delivered to A & P with "reasonable dispatch" within the meaning of that term in Section 2 of the "contract, terms and conditions" of the uniform straight bill of lading.

For the purpose of this lawsuit only Defendant concedes that if the plums had been sold on the wholesale market in New York on June 12, 1956 the price per crate would have been 74¢ per crate less than if such sale had been made on such wholesale market on June 11, 1956 (June 10, 1956 was a Sunday and therefore the wholesale market quotations for Monday, June 11, 1956 are used by the wholesale produce trade to determine the wholesale market prices for produce delivered on Sunday by a carrier). The plums were intended for sale and were sold at retail in A & P stores in the New York City area and were not sold at wholesale.

It is the practice of A & P to purchase produce from growers in the area where such produce is grown and to have it shipped to itself by common carrier in the area where the produce is to be sold in A & P retail stores. A & P orders produce from the growing area on the basis of the estimated need for such produce in the retail stores within 24 hours after the usual and customary shipping time for the retail store area from the growing area. Title to the contents of the shipment passes to A & P from the growers when the contents are loaded by the growers into the freight cars for shipment. These purchases and shipments are made by A & P for the purpose and with the intent of sale at retail in the A & P stores located in the respective destination areas. A & P does not sell on the wholesale market. Produce is not stored for future use by A & P in either warehouses or retail stores. A & P constantly moves the produce to the retail stores in time for sale in those stores on the day following its receipt by A & P from the carrier.

The practices described above were followed with respect to the shipment of plums herein.

In the New York metropolitan area, pursuant to instructions from A & P, there is a routine practice for the carrier delivering cars of produce to place such cars on the public inspection tracks for inspection by A & P personnel. Thereafter, when a car is accepted by A & P, an order is given to the carrier to move such car to an A & P private siding for unloading. Customarily such car is delivered to the A & P private siding on the day on which it is inspected and accepted by A & P personnel at the public inspection tracks. From 12 to 24 hours may elapse from the time such car is placed on the public inspection tracks until it is delivered to the A & P private siding. At times A & P will arrange for immediate unloading of such cars of produce to trucks at the public inspection tracks for direct delivery to retail stores. On occasion A & P may issue diversion orders to move a car from the public inspection tracks to shipment to the city. On rare occasions A & P may allow a car to remain at the public inspection tracks after acceptance for a day or two before ordering the carrier to move the car to the A & P private siding. Cars are customarily unloaded by A & P promptly after they are delivered by the carrier to an A & P private siding. However, a car may remain at the A & P private siding from two hours to (on very rare occasions) 55 hours before it is released by A & P for return to the railroad.

A & P issues to all retail stores in the New York metropolitan area a daily price list which shows a retail selling price for each item of produce for that day. The price shown for plums on said A & P daily price list did not change during the period from June 10, 1956 to June 15, 1956. Each retail store manager has independent authority from A & P to determine whether produce should be offered for sale at prices lower than the prices shown in said price list and how often such prices should be reduced. Although the daily retail price lists for the entire month of June 1956 are not available, A & P concedes for purposes of this case that the prices quoted on such lists for plums of the kind and quality involved herein during the month of June, 1956 did not change as frequently as the wholesale market prices and did not move up or down in relation to changes in the wholesale mar-

ket prices during that period. The wholesale market price of produce is considered as one of the several factors used by A & P in determining the retail prices to be included in the price lists described above.

A & P does not keep and to the knowledge of its officers and employees has never kept records which would disclose with respect to shipment of produce sold at retail (a) whether all of such produce has been sold, (b) the date or time of day when such produce was sold, (c) the store at which such produce was sold, (d) whether such produce was commingled with other produce of the same kind or quality at some A & P retail stores, or (e) any facts about the sale of such produce, including the price at which it was sold other than the daily price list described above and advertisements, neither of which constitutes a record of actual sales.

There was no physical damage to or deterioration of the plums. A & P bases its claim for damages in this action solely on delay in the transportation and delivery of the plums and the decline in the wholesale market price during the period of such delay as set forth above.

Plaintiff points out that this case involves a head-on collision between the excuse of "injury without damage" and the axiom of "every wrong has a remedy". Broadly speaking, I would agree since the delay of two days is a wrong and yet there was no physical damage to or deterioration of the plums which were merely sold by A & P at identical retail prices on Wednesday instead of Monday.

Since plaintiff in this case cannot look to retail prices as a measurement of damages, as it concedes is the natural impulse, it instead bases its claim on a decline in wholesale prices during the critical period. The obvious difficulty with plaintiff's contention is that the wholesale market criterion of damages suggested in this case is, as plaintiff recognizes, unrealistic. Except for plaintiff's theory of replacement which I cannot accept in this case, I find no correlation between the stipulated facts of the

wholesale market to justify this as measure of damages. A & P shipped its own plums intending them for sale and selling them at retail. The retail and wholesale market price levels move independently of each other. The wholesale prices on various kinds of plums of different quality and condition on Monday, June 11, 1956, consisted of 13 prices ranging from $3.77 to $7.60. It is not known how many crates sold at each price. The unweighted average was $4.93 per crate. On Tuesday, June 12, 1956, wholesale prices on various kinds of different quality and condition plums consisted of 30 prices ranging from $3.17 to $6.35, the unweighted average being $4.19, which accounts for the stipulated 74 cents decline in the wholesale market. I find that the wholesale market criterion suggested by plaintiff is, in this case, an illogical and improper measure of damages bearing no relationship to the facts. I find that the replacement value theory advanced by plaintiff is not applicable under the facts of this case since A & P did not purchase substitute plums in the New York wholesale market at the time when it should have received delivery of this shipment. Though A & P claims that it is impracticable to resort to retail prices to measure actual damages and cites various reasons, I am not convinced by its arguments and am of the opinion that damages can be ascertained and proved by resort to retail prices and other means where actual damage occurs in a given case. To apply this criterion in this case would result in an unjust enrichment to plaintiff. As Lord Atkinson said in denying plaintiff's claim in Wertime v. Chicoutime Pulp Co., L.R. (1911) A.C. 301, 308, that such a plaintiff seeks "against all justice to be permitted to make a profit by breach of contract, by compensating for a loss he never suffered, and be put, so far as money can do it, not in the same position in which he would have been if the contract had been performed but in a much better position." Also see U. S. v. Palmer & Parker Co., 1 Cir., 61 F.2d 455, 461; Pastor v. B. Lindner & Bro., 233 App.

Div. 396, 253 N.Y.S. 184, 187. A & P states that it lost profits because of this delay. It states that "A & P did not have the plums when they were needed to satisfy the needs of its stores and therefore its customers. This we submit establishes fact of damage." At another point it says "the inevitable result, therefore, was a scarcity of plums to satisfy customer demand on June 11. This scarcity was in no way relieved by the surplus which A & P had two days later as the result of the delayed delivery of the plums on top of those already ordered for delivery to meet A & P's needs at that time." It also states that "the real damage (loss of profits resulting from inability to sell at retail on June 11) cannot be proved * * * ". These statements imply that A & P would have been able to sell these plums only on Monday, June 11, but was unable to do so when the plums actually arrived, thereby losing the anticipated profits. Since there was no physical damage to or deterioration of the plums and since the plums were sold at identical retail prices, the facts are to the contrary. Further, there is nothing in the record about the other California Beauty Plums sold by A & P in its New York City stores during the days in question except to the extent that it may be inferred from the fact that daily prices for such plums were issued by A & P, that others were being sold. A & P has not shown how many other cars of these plums it received during this period either at the Harlem River receiving point or at other New York warehouses in the New York Metropolitan Area. The evidence reveals that the plums in this shipment were sold on Wednesday rather than on Monday and that A & P's practice was to order from the growers in California at least eight days or more in advance on the basis of the advanced estimate of need in the stores within 24 hours after delivery. The evidence also reveals that A & P allows itself a leeway of flexibility in time of railroad delivery of produce. It does this by having the railroad place cars on public inspection tracks at destination prior to delivery on the A & P private siding and 12 to 24 hours may elapse before the final railroad move is made. The cars are available to A & P at that earlier placement and at times A & P takes the produce from the cars at that point. Moreover, on rare occasions A & P may allow a car to remain at that earlier placement for a day or two before ordering the carrier to move it to the A & P private siding for unloading and release of the empty car. And on the siding A & P may allow the cars to wait from 2 to 55 hours before releasing the cars again to the railroad. Moreover, A & P diverts cars to other cities different from the original destination. With this built-in flexibility, there is no showing that A & P had fewer plums for sale in its stores on Monday than it had intended in advance or that it had more plums on Wednesday. Indeed, the fact that A & P did not find it necessary to purchase plums on the wholesale market to supply its stores for Monday, and to sell this shipment on that market as surplus, shows that there was no such rigidity of operations as A & P implies in its brief. Moreover, even if A & P sold a lesser quantity of plums on Monday than it had expected to sell, it suffered no loss by selling more plums on Wednesday instead of Monday at the same price level. From the facts before me, including the stipulated "usual practice" of plaintiff, I cannot assume, as plaintiff suggests, that A & P had no plums to satisfy customer demands on June 11th and that therefore A & P lost profits. For these reasons I find that A & P had failed to show a loss of profits.

Since this was an interstate shipment the Carmack Amendment, Title 49 U.S.C., Sec. 20(11) is applicable, which provides in part as follows:

"* * * any such common carrier, railroad, or transportation company so receiving property for transportation * * * or any common carrier, railroad, or transportation company delivering said property * * * shall be liable to the lawful holder of (the bill of lading) * * *

for the *full actual loss, damage, or injury* to such property caused by it or by any (connecting carrier) \* \* \* notwithstanding any limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; \* \* \*" (49 U.S.C.A. § 20 (11)).

I find that A & P had shown no actual loss, damage or injury and therefore is not entitled to recovery under the Carmack Amendment. Illinois Central Railroad Co. v. Crail, 281 U.S. 57, 63, 50 S.Ct. 180, 74 L.Ed. 699. Neither is plaintiff entitled to recover under the traditional common law concept of damages for, as Mr. Justice Stone stated in Illinois Central Railroad Co. v. Crail, supra, 281 U.S. at p. 63, 50 S.Ct. at p. 181, 74 L.Ed. 699: "This contention ignores the basic principal underlying common law remedies that they shall afford only compensation for the injury suffered."

In U. S. v. Palmer & Parker Co., 61 F.2d 455, at pp. 459, 460, the court stated:

"There is only one rule, of universal application, in such cases, and that is to give compensation for the loss suffered.

"\* \* \*

"To repeat, the applicable rule is the actual loss, to the appellee, by the delay in delivery of this cargo of logs, for use in its business as a manufacturer and seller of mahogany veneers, etc."

In Craig v. St. Louis-San Francisco Railway Co., 120 Kan. 105, 242 P. 117, the court stated as follows:

"For present purposes it may be said that an invasion of a legally protected interest imports injury, and injury is redressed by damages. Quantum of damages depends on extent of injury caused by the invasion. If nothing but the invasion appear, the injury is technical, and is compensated by nominal damages. To warrant substantial damages, there must be substantial injury. When substantial injury has been shown, the law concerns itself with expression of the idea of reparation in terms of money. \* \* \*"

In C. L. Hils Co. v. Cincinnati, N. O. & T. P. Ry. Co., 42 Ohio App. 103, 181 N.E. 819, at p. 821, the court stated as follows:

"Recovery of damages for delay in shipment must be limited to compensation for loss. Such damages are not to be identified as a penalty imposed upon the carrier for failure to deliver on time."

In Lorenzo Demase and Sam Manna, Partners Trading as Demase & Mann Company v. Pennsylvania Railroad Company, Court of Common Pleas of Allegheny County, Pennsylvania 1954, reported in 104 Pitts. Legal Journal 155, it is stated as follows:

"It is fundamental that in an action for damages the plaintiff must show the breach or other wrong by defendant; he must show that he was damaged in consequence of the wrong; and finally, the extent of damage is determined by applying some accepted measure. Here, plaintiffs showed delay on the part of the defendant carrier, and they presented evidence of decline in market value, the usual measure of damages in shipment cases. We cannot apply a customary measure of damages unless the fact of damage is first demonstrated, as the measure is, after all, only an accepted guide to get at the dollars and cents amount of damage sustained. In this case, the plaintiffs seek to recover what they might have lost had they planned to sell each shipment on the day it arrived. However, the fact remains that they did not show any actual loss at all, for the reason that the tomatoes were first processed through the ripening plant, mingled with other shipments and repacked, and plaintiffs themselves

made no attempt to trace the sale of the tomatoes in any particular shipment. Indeed, when the tomatoes were eventually sold sometime after their arrival date, plaintiffs may just as likely have realized a gain rather than a loss. To arbitrarily apply a measure of recovery whenever delay in transit occurs, without any showing of whether or not a loss was actually occasioned, would render the damages speculative and punitive, rather than compensatory."

In Lapidus v. Chicago, B. & Q. R. Co., D.C., 161 F.Supp. 664, at p. 667, Judge Knoch entered the following findings of fact and conclusions of law:

"16. Plaintiffs proved that the Chicago wholesale market declined in an aggregate amount of $4,501.59 between the 6th and 7th mornings for perishables of the kinds that were carried in the 63 shipments. Plaintiffs did not prove that the perishables in the 63 shipments were comparable in quality and condition to those sold on the Chicago wholesale market, did not prove that they sold the perishables in the 63 shipments upon the declining markets between the 6th and 7th mornings, and did not prove that they suffered actual losses equivalent to the declines that the market experienced. * * *

"5. Plaintiffs' proof of loss because of market declines on goods allegedy delayed was insufficient to carry their burden of proof on the issue of damages where they relied exclusively on market quotations to establish the fact of decline, but failed to link the market quotation declines to their own experience in selling on the declining market, and failed to correlate the quality and condition of their own goods to the quality and condition of the goods in the market quotations."

Judge Learned Hand, in Weirton Steel Co. v. Isbrandtsen-Moller Company, 126

F.2d 593 at pp. 594–595, stated as follows:

"The ordinary rule is indeed that damages for injury to goods while in possession of a carrier are to be computed at the difference between the sound market value at destination and the value as damaged. * * * That is obviously the right measure where the consignee buys the goods for resale which is the ordinary case; but at times it works out to give him more than indemnity, and when it does, the courts have refused to adopt it. * * *

"We have therefore no doubt that, if it affirmatively appeared that the Texas Company had sold the cans and their contents at no reduction, the libellant could recover only the reconditioning costs; it seems to us plain that any other rule would violate the fundamental principal that damages are only to provide indemnity. * * * On a record like this it is quite as possible as not that the Texas Company sold the whole consignment at the market price; in any case it alone had all the information on that subject. * * * we know that all these cans were in fact sold, and it is entirely speculative to assume that they sold off price; and certainly it is impossible even to guess for how much off price. * * * "

In Missouri Pacific R. Co. v. H. Rouw Co., 258 F.2d 445 at p. 446 (1958), the court stated as follows quoting from American Jurisprudence, Damages, Section 13:

" 'The fundamental principle of the law of damages being compensation for the injury sustained, the plaintiff in a civil action for damages cannot * * * hold a defendant liable in damages for more than the actual loss which was inflicted by his wrong. * * * The law will not put him in a better position than he would be in had the wrong not been done or the contract not been broken.' "

I am asked in this case to apply a measure of damages which has, in my opinion, no logical relationship to the stipulated facts and which is indefinite and uncertain. From the facts in evidence I cannot thus depart from accepted traditional principles of the law of damages. Accordingly, I find the issues for the defendant and the cause is dismissed at plaintiff's costs.