The GREAT ATLANTIC & PACIFIC
TEA COMPANY, Inc., Plaintiff-
Appellant,

v.

The ATCHISON, TOPEKA AND SANTA
FE RAILWAY COMPANY,
Defendant-Appellee.

No. 14539.

United States Court of Appeals
Seventh Circuit.

June 25, 1964.

Thomas R. Mulroy, Daniel Walker,
Chicago, Ill., Hopkins, Sutter, Owen,
Mulroy & Wentz, Chicago, Ill., of coun-
sel, for appellant.

**706**

Kenneth F. Burgess, D. Robert Thomas, James W. Kissel, Chicago, Ill., D. Robert Thomas, Wilbur C. Delp, Jr., Sidley, Austin, Burgess & Smith, Chicago, Ill., for appellee.

Before HASTINGS, Chief Judge, and KNOCH and KILEY, Circuit Judges.

HASTINGS, Chief Judge.

The Great Atlantic & Pacific Tea Company, Inc. (A & P) brought this action against The Atchison, Topeka and Santa Fe Railway Company (Santa Fe). It sought to recover damages alleged to have resulted from an unreasonable and unexcused delay of two days in a shipment of plums from California to New York.

The case was submitted to the district court for decision solely upon a stipulation of facts, briefs and oral argument of the parties. The evidence consisted of the stipulation of facts and the bill of lading for the shipment.

The trial court found that A & P suffered no compensable damage resulting from Santa Fe's unreasonable and unexcused delay of two days in delivering the shipment of plums and dismissed the action. The memorandum, findings of fact and conclusions of law filed by Chief Judge William J. Campbell of the Northern District of Illinois were reported at 224 F.Supp. 903 (January 6, 1964). From this judgment of dismissal, A & P has appealed.

A & P represents that it now has pending in the Municipal Court of Chicago alone 5,769 separate claims against various carriers for delayed delivery of shipments and that there are a multitude of similar claims filed or to be filed in other courts. Although all such claims are not based on identical factual situations, it is said many of them are in a category similar to the case at bar. Both sides state this case is a test case for such claims. For this reason, we deem it advisable to set out the entire stipulation of facts as an Appendix to this opinion. Reference is now made thereto.

On June 2, 1956, A & P shipped a carload of plums from Red Bank, California consigned to itself at Harlem River, New York, one of its receiving stations for produce in the New York area. Santa Fe was the carrier and the shipment was made under a straight uniform bill of lading issued by Santa Fe and signed by both parties.

Under the usual and customary time for transportation and delivery of such a shipment, the plums should have been delivered to A & P prior to 9:00 A.M. on Sunday, June 10, 1956, ready for sale at retail in A & P stores in the New York City area on Monday, June 11, 1956. The plums were delivered to A & P by Santa Fe at 5:30 A.M. on June 12, 1956, two days late.

The two-day period of delay was unreasonable and unexcused but was not intentional.

The plums were sold at retail by A & P in its New York City outlets beginning on Wednesday, June 13, 1956. They were not sold at wholesale.

If the plums had been sold on the wholesale market in New York City on June 12, 1956, the average price per crate would have been 74 cents less than if such sale had been made on the wholesale market on June 11, 1956 (June 10, 1956 being Sunday). A & P neither bought nor sold any plums on the New York City wholesale market on any day during this critical period.

A & P purchased the plums with the intent of sale at retail on June 11, 1956. It issued to all of its retail stores in that metropolitan area a daily price list which set out a retail selling price for each item of produce for that day. The price shown for plums on such daily price list did not change during the period from June 10, 1956 to June 15, 1956. Each retail store manager had independent authority to lower the retail price of plums but not to increase the retail prices shown in the daily price list.

The daily price lists (and any advertisements) are the only records A & P keeps with reference to the actual retail price at which its produce is sold. The retail price of plums during June, 1956

did not change as frequently as the wholesale market prices and did not fluctuate in relation to changes in the wholesale market price, although the latter is one of several factors used in determining retail prices.

A & P does not keep records which would disclose with respect to shipments of produce sold at retail (a) whether all of such produce has been sold, (b) the date or time of day when such produce was sold, (c) the store at which such produce was sold, (d) whether such produce was commingled with other produce of the same kind or quality, or (e) any facts about the sale of such produce, including the price at which it was sold other than the daily price lists and advertisements, neither of which constitutes a record of actual sales.

*There was no physical damage to or deterioration of the plums by reason of the delayed shipment.*

A & P bases its claim for damages solely on delay in the transportation and delivery of the produce and the decline in wholesale market price during the period of such delay.

Under this measure of damages, A & P figures the difference between the cost of replacement on the wholesale market (as of June 11, 1956), reduced by the wholesale price at which the delayed goods could have been sold when delivered (June 12, 1956), this being the stipulated sum of 74 cents per crate. There were approximately 1,000 crates of plums in the carload shipment. A & P claims damage in the amount of $740.

Santa Fe is a "carrier" within the meaning of that word as used in the Interstate Commerce Act, as amended, and was the initial carrier as described in Section 20(11) of the Act, Title 49 U.S. C.A. § 20(11) for the shipment of the plums in question.

The plums were not transported and delivered to A & P with "reasonable dispatch" within the meaning of that term in Section (2) of the "Contract Terms and Conditions" of the uniform straight bill of lading.

A & P's theory of recovery based upon decline in wholesale market prices appears to be as follows: once A & P sustains its burden of proving that it has been injured by an unreasonable and unexcused delay in shipment by Santa Fe, then the wholesale market decline rule is appropriate as a method of determining the amount of actual damage, even though the item delayed was sold at retail; the burden of proving that the wholesale market decline rule will result in unjust enrichment to A & P is on Santa Fe; and, Santa Fe failed to sustain this burden.

Applicable in resolving the issues of recovery and measure of damage is Interstate Commerce Act, 49 U.S.C.A. § 20 (11) (sometimes referred to as the Carmack Amendment or the Cummins Amendment):

> "Liability of initial and delivering carrier for loss; limitation of liability; notice and filing of claim
>
> "(11)  *  *  *  [A]ny such common carrier, railroad, or transportation company so receiving property for transportation *  *  * or any common carrier, railroad, or transportation company delivering said property *  *  * shall be liable to the lawful holder of *  *  * [the] bill of lading *  *  * for the *full actual loss, damage, or injury* to such property caused by it  *  * notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; *  *  * " (Emphasis added.)

The general common law rule of damages in cases of unreasonable delay and damage to goods in shipment is the difference in the market value of the goods at the date and in the condition they were contracted to arrive at their

destination and the date on and the condition in which they actually arrived. New York, Lake Erie & Western Railroad Co. v. Estill, 147 U.S. 591, 616–617, 13 S.Ct. 444, 37 L.Ed. 292 (1893); Mitsubishi Shoji Kaisha v. Davis, S.D.N.Y., 291 F. 882, 884 (1922); aff'd (2d Cir.) 291 F. 57, cert. denied, 263 U.S. 706, 44 S.Ct. 34, 68 L.Ed. 516; Sangamon and Morgan Railroad Co. v. Henry, 14 Ill. 156, 157 (1852).

The theory which underlies the award of damages based upon market value rather than the shipper's resale contract price to third persons is that the shipper has an opportunity to purchase at the market price on the contracted arrival date to fulfill contracts and can sell the delayed or damaged goods at the market price on the date of their arrival in order to mitigate its damages. Mitsubishi Shoji Kaisha v. Davis, 291 F. at 884; Czarnikow-Rionda Co. v. Federal Sugar Refining Co., 255 N.Y. 33, 173 N.E. 913, 915, 88 A.L.R. 1426 (1930).

The market value rule has been applied in the absence of a purchase by the shipper at the market price on the contracted for arrival date to fulfill existing contracts. Ibid.

The measure of damages in delay and damaged goods cases is actual damages, and the market value rule has been adopted as a method to ascertain actual damages. Its adoption is due to its simplicity in application, the probability that it comes close to actual damages in most cases and the policy that "as against the wrongdoer, the law is willing to disregard the possibility that an award of market value at the time of the wrong may be too much." McCormick, Damages § 48, at 184 (1935). "[T]he wrongdoer shall bear the risk of the uncertainty which his own wrong has created." Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946).

█ Since the market value rule is merely a method, it is not applied in cases where it is demonstrated that another rule will better compute actual

damages. It has been held that the burden of proving that the market value rule will not result in a just measure of actual damage is on the carrier. Reider v. Thompson, 5 Cir., 197 F.2d 158, 160 (1952).

In United States v. Palmer & Parker Co., 1 Cir., 61 F.2d 455, 459 (1932), a suit for damages due to delay in shipment, the court stated:

"We think the court below erred in applying the market value of logs to this case. There is only one rule, of universal application, in such cases, and that is to give compensation for the loss suffered. Frequently, this ideal is found impossible of complete attainment; perhaps generally the market value rule is found to be the nearest approach to reaching the actual loss. But the market value rule is inapplicable when, on the facts, it is not the nearest practicable approach to an ascertainment of the actual loss. Each case must be governed by its own facts."

The Carmack Amendment, supra, does not appear to have changed the common law rules discussed above.

The Illinois Supreme Court in Wood & Co. v. Chicago, M. & St. P. Ry. Co., 320 Ill. 341, 343, 151 N.E. 229, 231 (1926) stated that, "The [Carmack] amendment does not establish a new measure of damages but simply prohibits the carrier from limiting its liability at common law, thereby leaving the measure of damages the same as it was at common law."

In Fort Worth and Denver Railway Co. v. United States, 5 Cir., 242 F.2d 702, 705 (1957), the court said, "The amount of damages provided by § 20(11) [The Carmack Amendment] is the full actual loss, damage or injury to such property at destination. * * * We are of the opinion that the rule of damage measurement by fair market value at destination should be followed here."

As at common law, the fair market value rule is not applied when actual

damage can more nearly be ascertained by other means. The Supreme Court, in a case involving the Cummins Amendment, refused to apply the market value rule and stated, "The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable." Illinois Cent. R. Co. v. Crail, 281 U.S. 57, 64–65, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930).

A & P contends that upon application of the above rules it is entitled to recover damages based upon the market value (wholesale) at destination even though the plums were for retail sale, since Santa Fe failed to sustain its burden of proving that another rule would more closely compute actual damage.

█ We do not reach this contention, however, since it is our view that A & P has failed to sustain its burden of proving that it suffered actual damage due to the delay in delivery. While we express no opinion thereon, it is possible that the wholesale market price at destination could be appropriate as a method of ascertaining the actual damage to goods sold at retail, due to the difficulty in ascertaining retail prices. Yet, before the appropriateness of this method comes into issue, it is mandatory that the shipper prove that it has suffered actual damage due to delay in its sale at retail.

A & P has cited numerous cases in support of its argument that decline in wholesale market price should be used as a measure of damages. But, in every case cited, it was shown that the shipper had suffered actual damage. E. g., McNeely & Price Co. v. Ellerman & Bucknall S. S. Co., E.D.Pa., 100 F.Supp. 339, 340 (1950) ("the damaged bales were examined by surveyors, and the damage found to be one-third their value."); Mitsubishi Shoji Kaisha v. Davis, 291 F. at 885 (action for conversion by carrier of steel bars); Sangamon and Morgan Railroad Co. v. Henry, 14 Ill. at 157 (shipment of hogs had to be sold before reaching their destination, at reduced price, due to delay and cold which injured hogs); New York, Lake Erie & Western Railroad Co. v. Estill, 147 U.S. at 593, 594, 13 S.Ct. 444 (as result of train wreck, cattle were killed and injured); and, Atlantic Mutual Insurance Co. v. Poseidon Schiffahrt, 7 Cir., 313 F.2d 872, 873 (1963) (the amount received for the goods was shown to be less than the market value at the time and place they were contracted to arrive).

The parties in the instant case stipulated that, "There was no physical damage to or deterioration of the produce. Plaintiff bases its claim for damages in this action solely on delay in the transportation and delivery of the produce and the decline in wholesale market price during the period of such delay * *."

The district court found that "the plums * * * were merely sold by A & P at identical retail prices on Wednesday [the date of delivery] instead of Monday [the anticipated date of delivery]." 224 F.Supp. at 905.

It further found, "From the facts before me, including the stipulated 'usual practice' of plaintiff, I cannot assume, as plaintiff suggests, that A & P had no plums to satisfy customer demands on June 11th and that therefore A & P lost profits." Id., 224 F.Supp. at 906.

"I find that A & P had shown no actual loss, damage or injury and therefore is not entitled to recovery under the Carmack Amendment." Id., 224 F.Supp. at 907.

A & P contends that these findings are clearly erroneous. It argues:

"It is the nondelivery of perishables when needed by A & P on Monday, June 11, that establishes the fact of damage; it is on that date that the injury to A & P was complete and its rights were fixed.

* * * * * *

" * * * [W]e have shown two key facts which the district court did not and could not deny. First is the stipulated fact that the Santa Fe was guilty of unreasonable and

unexcused delay in delivering perishables to A & P. Second is the district court admission that 'A & P constantly moves the produce to the retail stores in time for sale in those stores on the day following its receipt by A & P from the carrier.'

"It automatically follows from these key findings that A & P was injured on Monday, June 11, when it did not have for sale at retail on that day the plums which it had ordered for delivery on Sunday, June 10, to fulfill the stores' needs on the following day. This is the injury to A & P; this is the 'fact of damage.'"

■ Unexcused and unreasonable delay in shipment does not establish, *ipso facto,* actual damage. In the absence of a showing of, e. g., decline in retail price, physical damage or deterioration, or sale at a reduced price on a "quick-sale" counter due to delay and anticipated spoilage we fail to see how A & P has established actual damage.

Proof of decline in wholesale price does not establish actual damage since the parties stipulated that A & P's daily price list issued to its retail stores "did not move up or down in relation to changes in the wholesale market prices during that period."

■ Unexcused and unreasonable delay establishes a wrong, but in the absence of proof of actual damage such wrong is not compensable under the Carmack Amendment or at common law. The opinion of the district court cites and quotes from cases which discuss the distinction between proof of a wrong and proof of damage. We adopt this portion of the district court's opinion. 224 F. Supp. at 907–909.[1]

Another facet of A & P's case, upon which it lays particular emphasis, concerns the finding of the district court that *"the plums * * * were * * * sold by A & P at identical retail prices on Wednesday instead of Monday."* (Emphasis added.) A & P contends that this finding is not supported by the stipulated facts or the evidence.

It is our judgment that this finding was the only reasonable one which the stipulation and evidence would permit the district court to make.

■ The burden of proving that the plums were sold at a different retail price on Wednesday than they could have been sold for on Monday was on A & P. The facts to establish such proof were peculiarly within the sole reach of A & P and this burden may not be shifted to Santa Fe.

It was stipulated that the plums had not deteriorated, were not physically damaged and that the daily retail price list, which A & P issued to its stores, did not change the suggested price of plums during the period in issue.

A & P offered no evidence to show that its stores, due to delay in shipment, did not sell all the plums received or that they exercised their discretion and reduced the price.

We hold that the district court's findings challenged by A & P are not clearly erroneous and that A & P has not sustained its burden of proving actual damage as required by the Carmack Amendment. The district court, in reaching its decision, correctly considered and applied the applicable law.

The judgment appealed from is affirmed.

*Affirmed.*

1. See Illinois Cent. R. Co. v. Crail, 281 U.S. 57, 50 S.Ct. 180 (1930); Missouri Pacific Railroad Company v. H. Rouw Company, 5 Cir., 258 F.2d 445 (1958), cert. denied, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302; Weirton Steel Co. v. Isbrandtsen-Moller Co., 2 Cir., 126 F.2d 593 (1942); United States v. Palmer & Parker Co., 1 Cir., 61 F.2d 455 (1932);

Lapidus v. Chicago, Burlington & Quincy Railroad Co., N.D.Ill., 161 F.Supp. 664 (1958); Craig v. St. Louis-San Francisco Ry. Co., 120 Kan. 105, 242 P. 117 (1926); C. L. Hils Co. v. Cincinnati, N. O. & T. P. Ry. Co., 42 Ohio App. 103, 181 N.E. 819 (1931); and, Lorenzo Demase, et al. v. Pennsylvania Railroad Company et al., 104 Pitts. Legal Journal 155.

## APPENDIX.

### STIPULATION OF FACTS.

\* \* \* \* \* \*

1. Plaintiff, The Great Atlantic and Pacific Tea Company (herein sometimes referred to as "A & P"), is a New Jersey corporation engaged solely in the retail grocery business, operating retail stores in which it sells fresh fruits and vegetables and other items.

2. Defendant, The Atchison, Topeka and Santa Fe Railway Company, is a corporation engaged in business in Illinois and other states as an interstate common carrier by railroad. Defendant is a "carrier" within the meaning of that word as used in the Interstate Commerce Act, as amended, and was the initial carrier as described in Section 20(11) of the Interstate Commerce Act for the shipment described in paragraph 3 hereof. Said shipment was made under a Uniform Straight Bill of Lading which was issued by the initial carrier and signed by A & P and the initial carrier. A copy of the said Bill of Lading may be offered and received in evidence.

3. On June 2, 1956, a shipment was made by A & P consisting of a carload of California Beauty Plums (herein sometimes called "the produce"), from Redbank, California, consigned to A & P at Harlem River, New York, which is a receiving point for A & P for produce for the New York City area. The produce was delivered to A & P by the delivering carrier at 5:30 A.M. on June 12, 1956. Under the usual and customary time for transportation and delivery by railroad from Redbank, California to Harlem River, New York, the produce should have been delivered to A & P prior to 9:00 A.M. on June 10, 1956.

4. The period of delay was unreasonable and unexcused but was not intentional. The produce was not transported and delivered to A & P with "reasonable dispatch" within the meaning of that term in Section (2) of the "Contract Terms and Conditions" of the Uniform Straight Bill of Lading.

5. Since June 10, 1956 was a Sunday, the wholesale market quotations for Monday, June 11, 1956 are used by the wholesale produce trade to determine the wholesale market prices for produce delivered on Sunday by the carrier. For the dates June 11, 1956 and June 12, 1956 the "New York Daily Detailed Deciduous Report" (referred to in paragraph 15 hereof) showed the following data on wholesale market sales of California Beauty Plums in the New York City area:

### MONDAY, JUNE 11, 1956

| Origin | Brand | Crates | Size | | | | | |
| | | | 3 × 4 | 4 × 4 | 3 × 4 × 5 | 4 × 5 | 5 × 5 | Average |
|---|---|---|---|---|---|---|---|---|
| Parlier | Wagon Wheel | 1,047 | | $6.65 | | $5.05 | $4.17 | $4.98 |
| Calif. | Blue Bird | 839 | | | | 5.02 | 3.77 | 4.34 |
| Arvin | Cinderella | 1,040 | | 7.15 | $5.90 | 5.26 | 4.21 | 4.77 |
| Fresno | Clo-Cal | 720 | | 7.60 | 6.15 | 5.75 | 4.35 | 5.80 |
| | | | | | | | | $4.93 |

### TUESDAY, JUNE 12, 1956

| Origin | Brand | Crates | 3 × 4 | 4 × 4 | 3 × 4 × 5 | 4 × 5 | 5 × 5 | Average |
|---|---|---|---|---|---|---|---|---|
| Arvin | Cinderella | 610 | | $5.10 | $4.50 | $4.19 | $3.50 | $4.06 |
| Arvin | Arra | 968 | | 5.75 | 4.95 | 4.36 | 3.46 | 4.04 |
| Arvin | Cinderella | 777 | | 5.25 | 4.60 | 4.13 | 3.31 | 3.73 |
| Parlier | Wagon Wheel | 1,045 | | 5.85 | 5.00 | 4.41 | 3.41 | 4.40 |
| Redbank | Old Mission | 1,049 | $5.90 | 5.90 | 5.20 | 4.51 | 3.75 | 4.64 |
| Parlier | Wagon Wheel | 1,045 | | 6.01 | 5.00 | 4.42 | 3.42 | 4.55 |
| Parlier | Wagon Wheel | 1,047 | | 6.20 | 5.05 | 4.43 | 3.31 | 4.13 |
| Parlier | Wagon Wheel | 1,050 | | 6.35 | 5.15 | 4.37 | 3.17 | 3.80 |
| | | | | | | | | $4.19 |

For the purpose of this lawsuit only, defendant concedes that if the produce described in paragraph 3 hereof had been sold on the wholesale market in New York on June 12, 1956 the price per crate would have been 74 cents per crate less than if such sale had been made on such wholesale market on June 11, 1956. The produce described in paragraph 3 hereof was intended for sale and sold at retail in A & P stores in the New York City area and was not sold at wholesale.

6. It is the practice of A & P to purchase produce from growers in the area where such produce is grown and to have it shipped to it by common carrier in the area where the produce is to be sold in A & P retail stores. A & P orders produce from the growing area on the basis of the estimated need for such produce in the retail stores within 24 hours after the usual and customary time for the arrival of the produce from the growing area. Title to the contents of the shipments passes to A & P from the growers when the contents are loaded by the growers into the freight cars for shipment. These purchases and shipments are made by A & P for the purpose and with the intent of sale at retail in the A & P stores located in the respective destination areas. A & P does not sell on the wholesale market.

7. Produce is not stored for future use by A & P in either warehouses or retail stores. A & P customarily moves the produce to the retail stores in time for sale in those stores on the day following its receipt by A & P from the carrier.

8. The practices described in paragraphs 6 and 7 hereof were followed with respect to the contents of the shipment described in paragraph 3 hereof.

9. There was no physical damage to or deterioration of the produce. Plaintiff bases its claim for damages in this action solely on delay in the transportation and delivery of the produce and the decline in wholesale market price during the period of such delay, as set forth in paragraph 5 hereof.

10. After delivery of the shipment described in paragraph 3 hereof, plaintiff filed with defendant a timely written claim for damages claimed to have resulted from the delay in delivery. The claim was for $740 and was computed on the basis stated in paragraph 5 hereof. After the claim was filed, defendant notified plaintiff that the claim was denied.

11. A & P does not keep, and to the knowledge of its officers and employees has never kept, records which would disclose with respect to shipments of produce sold at retail (a) whether all of such produce was sold, (b) the date or time of day when such produce was sold, (c) the store at which such produce was sold, (d) whether such produce was commingled with other produce of the same kind or quality at some or all A & P retail stores, or (e) any facts about the sale of such produce, including the price at which it was sold other than the daily price lists described in paragraph 12 hereof and the advertisements described in paragraph 15 hereof, neither of which constitutes a record of actual sales.

12. A & P issues to all retail stores in the New York Metropolitan area a daily price list which shows a retail selling price for each item of produce for that day. The price shown for California Beauty Plums on said A & P daily price lists did not change during the period from June 10, 1956 through June 15, 1956. Each retail store manager has independent authority from A & P to determine whether produce should be offered for sale at prices lower than the prices shown in said price lists and how often said prices should be reduced. Although the daily retail price lists for the entire month of June, 1956 are not available, A & P concedes, for purposes of this case, that the prices quoted on such lists for produce of the kind and quality involved herein during the month of June, 1956 did not change as frequently as the wholesale market prices, and did not move up or down in relation to changes in the wholesale market prices during that period.

13. During the A & P's fiscal year ending February 28, 1957 (which included the period of the delayed shipment of produce referred to in this Stipulation), the following information with respect to A & P was applicable:

### Retail Stores

Total A & P retail stores in the United States ................4,013
Total A & P retail stores in the New York Metropolitan area [1] ... 667

### All Sales

Total of all sales by A & P in the United States ........$4,301,156,000
Total of all sales by A & P in the New York
  Metropolitan area .............................$ 871,062,000

### Produce Sales Only

A & P's total sales of produce in the United States .....$  406,138,602
A & P's total sales of produce in the New York
  Metropolitan area .............................$   78,831,111

### Cars of Produce

Total number of cars of produce delivered by carriers to A
  & P in the United States ............................  70,702

Total number of cars of produce delivered by carriers to A
  & P in the United States with respect to which A & P filed
  claims against the carriers for delayed delivery ..........  2,491*

Total number of cars of produce delivered by carriers to A
  & P in the New York Metropolitan area ................  13,885

Total number of cars of produce delivered by carriers in the
  New York Metropolitan area to A & P after delay in transit on part of carriers ...............................  3,497*

Total number of cars containing produce delivered to A & P
  in the New York Metropolitan area with respect to which
  A & P filed claims against the carriers for delayed deliveries .........................................  894*

### Capacity of a Car of Plums

Approximate number of "California Beauty Plums" customarily shipped in one freight car equipped for shipping
  produce .........................................  218,236

Approximate number of crates containing "California Beauty
  Plums" customarily shipped in one freight car equipped to
  ship produce .....................................  1,000

---

In the New York Metropolitan area and in other metropolitan centers, pursuant to instructions from A & P, there is a routine practice for the carriers delivering cars of produce to place such cars on the public inspection tracks for

1. The New York Metropolitan area consists of New York City, Staten Island, Westchester County, Long Island, Rockland County and Orange County, all in the State of New York, together with the central and northern area of New Jersey and the southern part of Connecticut. This area is not served by only one A & P warehouse.

* The defendant carrier does not agree that in all such cases the cars were delayed beyond the usual and customary time for transportation or that any delays beyond that time were unreasonable or unexcused.

inspection by A & P personnel. Thereafter, when a car is accepted by A & P, an order is given to the carrier to move such car to an A & P private siding for unloading. Customarily such car is delivered to the A & P private siding on the day on which it is inspected and accepted by A & P personnel at the public inspection tracks. From 12 to 24 hours may elapse from the time such car is placed on the public inspection tracks until it is delivered to the A & P private siding. At times A & P will arrange for immediate unloading of such cars of produce into trucks at the public inspection tracks for direct delivery to retail stores. On occasion, A & P may issue diversion orders to move a car from the public inspection tracks to some other city. On rare occasions A & P may allow a car to remain at the public inspection tracks after acceptance for a day or two before ordering the carrier to move the car to the A & P private siding. Cars are customarily unloaded by A & P promptly after they are delivered by the carrier to an A & P private siding. However, a car may remain at the A & P private siding from two hours to (on very rare occasions) 55 hours before it is released by A & P to the railroad.

14. The wholesale market price of produce is considered as one of several factors by A & P in determining the retail prices to be included in the price lists which are described in paragraph 12 hereof. The retail prices as shown in these price lists issued by A & P do not change as frequently as the wholesale market prices and often do not move up or down in relation to changes in the wholesale market prices.

15. In New York the "New York Daily Detailed Deciduous Report," published by the New York Daily Fruit and Vegetable Reporter, is the established source furnishing data from which shippers and carriers determine daily wholesale market prices for produce for which there have been sales of produce of like size, kind and quality on the day in question. As to retail prices, there are available in New York the A & P produce price lists described in paragraph 12 hereof and the advertised produce prices of A & P in the retail stores. The prices of many items of produce are not advertised by retail stores each day. Except to the extent that produce prices are advertised and the prices of such internal records of other retail stores as may be available, there are no other sources for obtaining retail market prices for produce in New York. There is no single, established source for obtaining retail prices which reflect actual produce transactions by retail stores in the New York City area.

16. This stipulation is entered into solely for the purpose of this case and shall not bind the parties in any other action.