**FEDERATED DEPARTMENT STORES, INC., d/b/a Burdines, Plaintiff,**

v.

**Norman C. BRINKE and Florida East Coast Railway Company, a Florida corporation, jointly and severally, Defendants.**

Civ. No. 69–1021.

United States District Court, S. D. Florida.

Aug. 22, 1970.

Bernard C. Pestcoe, of Hollander & Pestcoe, Miami, Fla., for plaintiff.

John T. Bond and Richard B. Austin, Miami, Fla., for defendant Brinke.

Shutts & Bowen, Miami, Fla., for defendant Florida East Coast Railway.

## MEMORANDUM OPINION

FULTON, Chief Judge.

This action arises under the Interstate Commerce Act, 49 U.S.C. § 20(11), commonly referred to as The Carmack Amendment. Jurisdiction is invoked pursuant to Title 28, Section 1337 of the United States Code.

The suit was brought by Federated Department Stores, Inc., d/b/a Burdines (Burdines) against Norman C. Brinke (Brinke) who is stipulated by the parties to be a "freight forwarder" under the Interstate Commerce Act, and against the Florida East Coast Railway Company (F.E.C.), a regulated rail common carrier.

At the Pretrial Conference, F.E.C. was granted a summary final judgment, which discharged F.E.C. of and from any and all liability in this cause. It was likewise stipulated that Brinke's duties, responsibilities and liabilities, if any, were pursuant to 49 U.S.C. § 20(11).

Burdines, which operates a number of department stores in the south Florida area and maintains retail stores and warehouse facilities at Miami, ordered 1,509 electric fans and stands from Frigid Incorporated (Frigid) in Brooklyn, N. Y.

Brinke maintains business offices in Miami and in Jersey City, New Jersey. For a number of years prior to the relevant dates of this law suit, Brinke conducted the business of a freight forwarder for Burdines and others, although Brinke was licensed only as a broker. Pursuant to stipulation between the parties and provisions of the Act, the

Court finds and concludes that for purposes of this action Brinke was a freight forwarder in the handling of the goods in question. The evidence shows that Brinke had acted as a freight forwarder for Frigid over a period of time prior to the time involved herein, and that Brinke did so as frequently as once a week. Sometime prior to June 24, 1968, Frigid, acting through its traffic manager in Brooklyn, whose name is Koch, contacted Brinke's manager in Jersey City, whose name is Maxwell. Koch advised Maxwell that Frigid had an order for fans and needed a trailer for the shipment. Koch testified that he didn't specify the type of trailer because he had never used any trailer except one that was entirely enclosed. Maxwell testified that he told Koch that there were no trailers then available but that he would provide one as promptly as possible. Maxwell stated that he was unable to secure an enclosed van, so he sent a trailer which had a canvass top; and that when the trailer reached Frigid's shipping platform, there was a conversation between Maxwell and Koch concerning the canvas top, during which Maxwell agreed to place a polyethylene lining under the canvas top after the truck was loaded. Koch testified that when he spoke to Maxwell about the canvas top he was assured by Maxwell that the fans would arrive in Miami in good shape.

The evidence shows that the truck was loaded by Koch, with Brinke's driver assisting and making a count as the items were placed aboard. Koch testified that the fans were all in good condition when they were loaded. It was admitted by Brinke from the witness stand that 1,509 units were loaded aboard the truck at the time and place in question. The fans were loaded and transported under a Straight Bill of Lading, which had the notation upon it "shippers load and count".

The shipment moved under this Bill of Lading with Brinke furnishing the transportation from Frigid's loading platform to the Brinke warehouse in Jersey City where Maxwell personally removed the canvas tarpaulin and placed plastic lining underneath. In order to do this it was necessary for Maxwell to untie the tarpaulin, roll it back and put the plastic lining under it and then replace the tarpaulin. Immediately thereafter Brinke delivered the trailer to a railroad carrier where it was shipped by rail piggyback plan via the Southern Railway and the Florida East Coast to the Florida East Coast rail yard in Hialiah, Florida, where it was picked up by Brinke and delivered to its destination at the Burdines' warehouse in Miami, Florida, on July 1, 1968.

Employees at Burdines opened the trailer and discovered that the inside of the carrier of the trailer was wet and water was dripping through holes in the tarpaulin and the plastic lining. When Burdines' employees discovered that the cartons were wet and the fans damaged, unloading was discontinued. The doors of the trailer were closed and no further action was taken until July 3, 1968, when the doors of the trailer were again opened and the unloading process continued until 481 cartons had been unloaded from the trailer at which time the unloading again ceased because of evidence of water damage to cartons and the fans. In the interim, Burdines had called Brinke and requested that Brinke send a tractor for the purpose of pulling the trailer away from Burdines' loading platform so that the trailer could be removed therefrom and re-located over the July 4th holiday. On July 5, 1968, Burdines notified Brinke that Burdines would take no further responsibility for the trailer and its contents, whereupon Brinke removed the trailer from the premises of Burdines and delivered its contents to a Brinke warehouse, where the cargo was unloaded on July 6, 1968.

Burdines retained approximately 400 of the fans, so the number that were placed in the Brinke warehouse on July 6, 1968, was the total shipment less that number. The exact number of cartons which were retained by Burdines is not certain. Thereafter, Brinke sent some of the fans to Frigid and delivered others to

Burdines, although Burdines contends that the deliveries were made to platform employees and were not authorized or receipted for by Burdines' management personnel. Anyway, Burdines now has in storage in one of its warehouses 966 separate pieces or cartons, consisting of 851 fans and 115 stands, which cost Burdines the sum of $11,129.47 and which had a salvage value of $4,000 in July of 1968. More will be said concerning the element of damages later.

■ Brinke denies any liability, claiming that Frigid approved and loaded the trailer and accepted the trailer as being suitable and let the shipment move under "shippers load and count", which modified Brinke's liability as a freight forwarder. Brinke contends, among other things, that some of the fans were rejected because they were tarnished, as opposed to being rusted; and therefore there is no proof from the plaintiff that the fans and stands were shipped by Frigid in good condition. The Court finds and concludes from the evidence that the fans and stands were shipped in good condition and that the damage thereto was caused by the water which penetrated the van while it was in transit from the Brinke warehouse in New Jersey to the Burdines warehouse in Miami. The Court finds and concludes that the liability of Brinke was not modified by the words "shippers load and count" which appears on the Bill of Lading, because Brinke's driver assisted in the loading of the cartons and counted them as they were loaded and receipted for them when loaded and because Brinke's New Jersey manager personally inserted the plastic lining under the tarpaulin canvas after assuring Frigid's traffic manager that the shipment would arrive in Miami in good condition. There is no evidence of any improper loading or misdescription of goods in the Bill of Lading. The evidence simply shows that Brinke, who had previously handled many similar cargoes for Frigid, all in a hard top van, was negligent in providing the canvas top van which was not secure because of the presence of holes in the outer tarpaulin and in the inner plastic lining.

■ The measure of damages under the Carmack Amendment is the actual loss, damage or injury caused by the carrier to the property transported. Great Atlantic & Pacific Tea Co. v. Atchison, Topeka & Santa Fe Ry. Co., 333 F.2d 705 (U.S.C.A. 7th (1964), cert. den. 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed. 2d 560 (1965).

■■ Ordinarily, damages for injury to goods while in possession of a carrier are to be computed at the difference between the sound market value at destination and the value as damaged, and such rule is the proper measure where the consignee buys the goods for resale, as here. Weirton Steel Co. v. Isbrandtsen-Moller Co., 2 Cir. 1942, 126 F.2d 593. In this case the value of the goods in question, if delivered in undamaged condition on schedule, would have been $11,-129.47. Burdines' witness, who testified as a salvage value expert, stated that the salvage value of the damaged cargo during July of 1968 was $4,000. Having found that the shipment left the Frigid loading platform in good condition and that all of the damage to the cargo is attributable to Brinke, the Court now finds that Burdines is entitled to recover over from Brinke the sum of $7,129.47, computed as follows:

| | |
|---|---|
| Value at time and place of destination undamaged | $11,129.47 |
| Less salvage value at time and place of destination | 4,000.00 |
| Damages | 7,129.47 |

■ Burdines has not offered any satisfactory proof of damages for late delivery. Neither has Burdines established satisfactory proof of damages for storage of the damaged cargo. Burdines is entitled to taxable costs in this action. The parties shall confer and agree upon an allowance for attorney's fees, in default of which plaintiff's counsel may apply through the Court.

This memorandum opinion shall serve as the Court's Findings of Fact and Conclusions of Law. Counsel for the plaintiff will prepare and submit to the Court a form for final judgment.